**BELL & HOWELL COMPANY,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**Local 399, International Union of Operating Engineers, AFL–CIO, Intervenor.**

**No. 75–2002.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 19, 1978.

Decided Jan. 8, 1979.

Certiorari Denied June 18, 1979.
See 99 S.Ct. 2885.

---

John P. Jacoby, Chicago, Ill., for petitioner.

Richard B. Bader, Atty., N. L. R. B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Marion Griffin, Atty., N. L. R. B., Washington, D. C., were on the brief, for respondent.

Sheldon M. Charone, Chicago, Ill, and Michael Fanning, Washington, D. C., were on the brief, for intervenor.

Also Michael J. Bartlett, Washington, D. C., entered an appearance for petitioners.

Before BAZELON, McGOWAN and ROBB, Circuit Judges.

Opinion for the Court filed by BAZELON, Circuit Judge.

BAZELON, Circuit Judge:

Petitioner Bell & Howell Co. (Bell & Howell) challenges an order of the National Labor Relations Board (NLRB) requiring Bell & Howell to bargain with Local 399, Operating Engineers (Local 399) as collective bargaining representative for Bell & Howell's stationary engineers at its Lincolnwood, Illinois facility.

Bell & Howell contends that it is not obligated to bargain with Local 399 because Local 399 allegedly discriminates against women in its membership policy and benefit plans. Bell & Howell also challenges certain evidentiary rulings made by the NLRB in the pre-election inquiry into the appropriateness of the bargaining unit. We affirm the Board's decision that Bell & Howell violated §§ 8(a)(5) and (1) of the Act.[1]

## I. BACKGROUND

On April 25, 1973, Local 399 petitioned the NLRB for a representation election for Bell & Howell's stationary engineers at Lincolnwood. The NLRB held hearings before

---

1. In *NLRB v. Mansion House Center Management Co.*, 473 F.2d 471 (8th Cir. 1973), the court held that an employer may introduce evidence of a union's racially discriminatory policies as a defense to a charge that the employer refused to bargain with the union in violation of § 8(a)(5). The Court, noting the constitutional problems that might arise should the Board make its "remedial machinery" available to a discriminatory union, held that

> the claim of racial discrimination allegedly practiced by a union seeking recognition as a representative bargaining unit under the act is a relevant area of inquiry for the Board

when the defense is appropriately raised before the Board upon a company's refusal to bargain.

*Id.* at 474. For the reasons that appear more fully herein, we are compelled to disagree with that conclusion.

*Mansion House*, and the Board's response to that decision, has been the subject of considerable interest. *See generally*, Axelrod & Kaufman, *Mansion House—Bekins—Handy Andy: The National Labor Relations Board's Role in Racial Discrimination Cases*, 45 Geo.Wash.L. Rev. 675 (1977); Leslie, *Governmental Action and Standing: NLRB Certification of Discrimi-*

a hearing officer to determine the appropriateness of the unit. During the course of that proceeding Bell & Howell sought production of Local 399's labor contracts and

natory Unions, 1974 Ariz.St.L.J. 35; Meltzer, *The National Labor Relations Act and Racial Discrimination: The More Remedies the Better?*, 42 U.Chi.L.Rev. 1 (1974); Note, *The Impact of De Facto Discrimination By Unions of the Availability of NLRB Bargaining Orders*, 47 S.Cal.L.Rev. 1353 (1974); Comment, 7 Ga.L. Rev. 770 (1973); Comment, 58 Minn.L.Rev. 335 (1973).

2. Specifically, Bell & Howell subpoenaed the following information:

1. Copies of all collective bargaining agreements to which Local 399 of the International Union of Operating Engineers ("IUOE") (including its Branch Locals 399B and 399C) is a party on the date of the issuance of this subpoena or has been a party during the five-year period prior to the date of the issuance of this subpoena.

2. Copies of all petitions for representation elections filed by Local 399 of the IUOE (including its Branch Locals 399B and 399C) with the National Labor Relations Board during the five-year period prior to the date of the issuance of this subpoena.

3. Copies of all agreements, except for agreements described in Item 1 above, pursuant to or under which an employer recognized Local 399 of the IUOE (including its Branch Locals 399B and 399C) as the collective bargaining representative for said employer's employees during the five-year period prior to the issuance of this subpoena.

4. Copies of all letters, correspondence, memoranda or other documents or records containing or relating to demands by Local 399 of the IUOE (including its Branch Locals 399B and 399C) for recognition as the collective bargaining representative for an employer's employees during the five-year period prior to the date of the issuance of this subpoena.

5. Copies of all letters, correspondence, memoranda or other documents or records relating to claims, during the ten-year period prior to the date of the issuance of this subpoena, that work should be or should have been assigned to employees represented by Local 399 of the IUOE (including its Branch Locals 399B and 399C) rather than to other employees, or that work should be or should have been assigned to other employees rather than to employees represented by Local 399 of the IUOE (including its Branch Locals 399B and 399C).

6. Copies of all letters, correspondence, memoranda or other documents or records

records of jurisdictional disputes involving Local 399.[2] These documents were necessary, in Bell & Howell's view, to shed light on the appropriateness of the unit.[3] At the

relating to strikes during the ten-year period prior to the date of the issuance of this subpoena, involving members of Local 399 of the IUOE (including its Branch Locals 399B and 399C), or involving other employees at plants or other facilities where Local 399 of the IUOE (including its Branch Locals 399B and 399C) also represented employees at the time of said strikes.

7. Copies of all unfair labor practice charges which have been filed with the National Labor Relations Board against Local 399 of the IUOE (including its Branch Locals 399B and 399C) under Section 8(b)(4)(D) of the National Labor Relations Act during the ten-year period prior to the date of the issuance of this subpoena.

8. Copies of all letters, correspondence, memoranda or other documents or records relating to proceedings before the National Labor Relations Board involving Local 399 of the IUOE (including its Branch Locals 399B and 399C) *under Section 10(k) of the* National Labor Relations Act during the ten-year period prior to the date of the issuance of this subpoena.

9. Copies of all letters, correspondence, memoranda or other documents or records relating to any joint board, arbitration or other proceedings (except for NLRB proceedings described in item 8 above), during the ten year period prior to the date of the issuance of this subpoena, involving the adjustment of disputes whether work should be or should have been assigned to employees represented by said Local 399 of the IUOE (including its Branch Locals 399B and 399C) or to other employees.

10. Copies of all letters, correspondence, memoranda or other documents or records relating to apprenticeship, training or education programs which have been in effect during the five-year period prior to the date of the issuance of this subpoena for employees represented by or members of Local 399 of the IUOE (including its Branch Locals 399B and 399C).

Joint Appendix (J.A.) 44–45.

3. Bell & Howell believed these documents were relevant to the Board's *Mallinckrodt* factors. *See Mallinckrodt Chemical Works*, 162 N.L. R.B. 387, 397 (1966). The *Mallinckrodt* factors guide the Board in determining the appropriateness of certifying a craft unit separately from an overall group of production and mainte-

request of Local 399, the Hearing Officer revoked Bell & Howell's subpoena on the grounds that the request was burdensome and the material irrelevant. Bell & Howell appealed unsuccessfully to the Regional Director, and the hearing then concluded.

After the hearing, Bell & Howell again appealed the evidentiary ruling to the Regional Director, who agreed to a limited reopening of the hearing to consider additional evidence on the appropriateness of the unit.[4] Bell & Howell then reissued the subpoena to Local 399. After much procedural wrangling, Local 399 finally produced ten sample contracts and offered to permit Bell & Howell to examine the remaining documents at Local 399's offices. Although Bell & Howell complains that this constituted "blatant refusal to comply with the subpoena," Br. for Bell & Howell at 8, the Regional Director held that by producing ten contracts and making the remainder available to Bell & Howell, the union had "sufficiently complied" with the subpoena. Joint Appendix (J.A.) 74. The Regional Director found that the stationary engineers were an appropriate unit. On February 11, 1974, the NLRB denied Bell & Howell's request for review of the Regional Director's decision. The election, held on February 15, 1974, resulted in seven votes for Local 399, one against.

On February 20, 1974, Bell & Howell moved to disqualify Local 399 from certification because the union allegedly discriminates against women. While the motion was pending, the NLRB announced its policy toward allegations of union discrimination in representation proceedings in *Bekins Moving & Storage Co.*, 211 N.L.R.B. 138 (1974). In *Bekins*, a plurality of the Board (Chairman Miller and Member Jenkins) sug-

gested that the Board could not constitutionally certify a union engaged in invidious discrimination. *Id.* at 139. The plurality therefore interpreted § 9(c)(1) of the Labor Management Relations Act (LMRA),[5] to require an inquiry into allegations of discrimination before certification but after the union involved actually won an election. The plurality did not enunciate what proof of discrimination would be necessary to disqualify a union, but suggested that not every violation of Title VII would be sufficient grounds for denying certification. The Board left the standards to be worked out in future adjudication.

Member Kennedy concurred in part in the plurality opinion. He would deny certification of a union only when the union discriminated in its *membership policy* on the basis of *race, alienage* or *national origin*. *Id.* at 145. He would not decline to certify when the complained-of practice was the union's failure to honor its duty of fair representation. *Id.* Members Fanning and Pennello dissented, arguing that the Constitution did not require the Board to consider allegations of discrimination prior to certification, and that the Act, § 9(c)(1), affirmatively forbade consideration of the issue.

Shortly after the decision in *Bekins*, the Board issued its first decision in this case. In *Bell & Howell Co.*, 213 N.L.R.B. 407 (1974), the Board refused to entertain Bell & Howell's allegations of discrimination. Members Fanning and Pennello (the dissenters in *Bekins*) were joined by member Kennedy, who declined to extend the *Bekins* principle to allegations of discrimination against women. Chairman Miller and Member Jenkins dissented, concluding that Bell & Howell had made out a prima facie

---

nance employees. They are typically used when a craft group seeks to sever itself from a broader collective bargaining unit that had previously included the craft members, but also may be "useful" when there has been no previous history of collective bargaining. *See Freemont Hotel, Inc.*, 168 N.L.R.B. 115, 117 (1967), and § III, *infra*.

**4.** The record was reopened to permit additional evidence on two of the *Mallinckrodt* factors:

(1) The history, practice and experience of Petitioner in representing the type of employees involved in the unit here petitioned for.
(2) The area and industry practice regarding the representation of the type of employees involved in the unit here petitioned for. J.A. 48.

**5.** 29 U.S.C. § 159(c)(1) (1976).

case of discrimination under *Bekins* and that the Board should therefore investigate the allegations.

■ In order to obtain judicial review of the NLRB's decision[6] Bell & Howell refused to bargain with Local 399. Local 399 brought unfair labor practice charges against Bell & Howell, and the Board, relying on its decision in the certification proceeding, ultimately granted summary judgment against the company, and found that the refusal to bargain violated §§ 8(a)(5) and (1) of the Act.[7] Bell & Howell Co., 220 N.L.R.B. 881 (1975).

On December 22, 1975, the NLRB decided *sua sponte* to reconsider its decision in this and three similar cases. On June 24, 1977, the NLRB issued its supplemental decision, affirming its earlier finding that Bell & Howell had violated §§ 8(a)(5) and (1) and ordering Bell & Howell to bargain with Local 399. *Bell & Howell Co.*, 230 N.L.R.B. 420 (1977). In the supplemental decision the Board followed the rationale of *Handy Andy*, 228 N.L.R.B. 447 (1977), which overruled *Bekins*. In *Handy Andy* the Board announced it would no longer consider evidence of invidious discrimination by a union prior to certifying the union as a collective

bargaining representative. The Board held that it is not constitutionally required to consider such evidence, and further, it is "*not authorized* to withhold certification of a labor organization duly selected by a majority of the unit employees. *Id.* at 448 (emphasis added).

## II. THE BOARD'S REFUSAL TO ENTERTAIN EVIDENCE OF DISCRIMINATION BY LOCAL 399

### A. *Employer's Standing to Challenge Union Discrimination*

■ Initially, we must determine whether Bell & Howell has standing to challenge the Board's certification of Local 399 where the challenge is based on Local 399's alleged discrimination against women.[8] The Board, relying on *Virginian Ry. Co. v. System Federation 40*,[9] contends that an employer lacks standing to assert the constitutional rights of its employees as a defense to the statutory obligation to bargain with the employees' chosen representative.

The economic consequences of a bargaining order to an employer appear sufficient to establish "injury in fact," the element of standing mandated by the case or controversy requirement of Article III.[10] An em-

---

6. Ordinarily, a decision to certify a union pursuant to § 9(c)(1) is not reviewable. *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1953); *McCulloch v. Libbey-Owens-Ford Glass Co.*, 131 U.S.App.D.C. 190, 191, 403 F.2d 916, 917 (1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969). An employer can obtain review of the Board's decision by refusing to bargain with the union and challenging the representation decision in an appeal from an unfair labor practice order. *Id.* A limited opportunity for direct review of the representation proceeding may be available under *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), where the Court held that the district court could entertain a challenge to the Board's decision to certify because the Board ignored a mandatory provision of the LMRA, § 9(b)(1).

7. Section 8(a)(5), 29 U.S.C. § 158(a)(5) (1976) provides, *inter alia*: "It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees . . . ."

8. In this opinion we treat interchangeably the question of whether the NLRB may *certify* a

discriminatory union and whether the Board may order an employer to *bargain with* a discriminatory union, once that union has been certified. This is appropriate because the obligation to bargain stems from the certification and the certification cannot be challenged except through a refusal to bargain. See note 6 *supra*.

9. 300 U.S. 515, 57 S.C⁺. 592, 81 L.Ed. 789 (1937). In *Virginian Railway* the Court held that an employer could not raise the rights of its employees as a defense to the duty to "treat with" a certified collective bargaining representative under § 2(9) of the Railway Labor Act, 45 U.S.C. § 152(9) (1970), *id.* at 558, and that the duty was enforceable by injunction. *Id.* at 549. *See* Leslie, *Governmental Action and Standing : NLRB Certification of Discriminatory Unions*, 1974 Ariz.St.L.J. 35, 38–47.

10. *See Craig v. Boren*, 429 U.S. 190, 194–195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Sierra Club v. Morton*, 405 U.S. 727, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Retail Clerks Union 1059 v. NLRB*, 121 U.S.App.D.C. 140, 141, 348 F.2d 369, 370 (1965); *Flast v. Cohen*, 392

ployer who has been found guilty of an unfair labor practice and has been ordered to bargain is also a "person aggrieved" within the meaning of § 10(f) of the Act.[11] Therefore, the employer is also well within the ambit of the statutory authorization to seek review.[12]

■ Normally, however, one who properly invokes the jurisdiction of a federal court "has standing to seek redress for injuries done to him, but may not seek redress for injuries to others." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972).[13] In challenging Local 399's certification, Bell & Howell did not allege that Local 399's discriminatory policies have or will cause any harm to Bell & Howell (*e. g.*, by preventing Bell & Howell from hiring female stationary engineers or causing Bell & Howell to violate statutes prohibiting discrimination against women.)[14]

■ The barrier against asserting the rights of third parties does not appear to be rooted in Article III itself, but rather is a prudential doctrine designed to limit unnecessary decisions of constitutional questions.[15] The rule against allowing a party to assert the constitutional rights of third persons has been relaxed in certain situa-

U.S. 83, 99–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

> The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."

*Id.* at 99, 88 S.Ct. at 1952, quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Standing thus looks to the appropriateness of the party to request adjudication of the issue. This suggests that the question of the employer's standing (in terms of "injury in fact") is inapplicable where the Board has cross-petitioned for enforcement of its order. See 3 K. Davis, Administrative Law Treatise § 22.07 at 236–239 (1958).

11. 29 U.S.C. § 160(f) (1976).

12. The fact that the Board has entered an order against Bell & Howell may in itself be sufficient to confer standing on the employer. "When the Board enters a final order against the charged party, it is clear that the phrase '[a]ny person aggrieved' in § 10(f) enables him to seek immediate review in the appropriate Court of Appeals." *U. A. W. Local 283 v. Scofield*, 382 U.S. 205, 210, 86 S.Ct. 373, 377, 15 L.Ed.2d 272 (1965). Certainly an employer meets a second, nonconstitutional standing requirement—that the interest the employer seeks to protect be "arguably within the zone of interests to be protected or regulated by the statute. . . ." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *cf. Barlow v. Collins*, 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (Brennan, J., concurring in the result and dissenting).

13. This issue is typically called the right to assert "constitutional *jus tertii*." *See generally*, Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court*, 71 Yale L.J. 599 (1962); Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv.L.Rev. 423 (1974).

14. In its reply brief to this court Bell & Howell raises for the first time the spectre of "interfer[ence] with [the employer's] ability to satisfy his obligations under the myriad of federal and state equal employment opportunity statutes." Reply Br. for Bell & Howell at 5. Bell & Howell does not specify how certification will interfere with its equal employment obligations, particularly in view of the fact that the union does not control the employer's hiring through an exclusive referral system. *See* Br. for Bell & Howell in case No. 13–RC–13022, filed July 20, 1973 (challenging the hearing officer's rulings). In its original brief, the employer relied on the fact that it was "aggrieved" by the order and urged that since the issue has been "vigorously and cogently argued," the court should not wait for an employee challenge. Br. for Bell & Howell at 29 n.19, *citing Craig v. Boren*, 429 U.S. at 192–197, 97 S.Ct. 451 in which the Court allowed a vendor to challenge the constitutionality of an Oklahoma law restricting sale of "3.2% beer" to males over 21 but permitting its purchase by females over 18.

15. [L]imitations on a litigant's assertion of jus tertii are not constitutionally mandated, but rather stem from a salutary "rule of self-restraint" designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative. *See, e. g., Barrows v. Jackson*, 346 U.S. 249, 255, 257, [73 S.Ct. 1031, 97 L.Ed. 1586] (1953); see also *Singleton v. Wulff*, 428 U.S. 106, 123–124, [96 S.Ct. 2868, 49 L.Ed.2d 826] (1976) (Powell, J., dissenting).

*Craig v. Boren*, 429 U.S. at 193, 97 S.Ct. at 455.

tions, particularly where the third party's interest might otherwise go unprotected.[16]

Whether in this case the interest would otherwise go unprotected depends on precisely how the "interest" at stake is defined. If the interest is in eliminating the union's discriminatory practices, there are alternative means of achieving this goal under both the LMRA (once the union has been certified) and Title VII,[17] and under both provisions the action can be brought by the victim of discrimination. If, on the other hand, the interest is in preventing certification of a discriminatory union, there may be no adequate alternative to allowing the employer to raise the issue. The right of a dissenting unit member, or an individual outside the unit, to intervene in a representation proceeding in order to raise the discrimination issue is questionable.[18] Moreover, even if such an individual could intervene, the nonreviewability of certification decisions might insulate from judicial review any Board decision in favor of the union.[19]

We think certification in itself is sufficiently important that the constitutionality of the practice announced in *Handy Andy*

should not be insulated from review. Our conclusion is reinforced by a concern that if the Board's certification of a discriminatory union violates the Fifth Amendment, then our enforcement of a bargaining order with such a union might equally violate the Fifth Amendment. We are mindful of the Court's observation in *Shelley v. Kraemer,* 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948): "[t]he Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals." We must therefore decide whether granting enforcement of this bargaining order would deny equal protection to those who are the victims of union discrimination, particularly where those persons might otherwise be precluded from challenging the constitutionality of the order on their own behalf.

We thus conclude that Bell & Howell has standing to raise the constitutional rights of victims of discrimination in this case. Although *Virginian Railway* implies a contrary result, that case was decided prior to a series of cases elaborating the *"jus tertii"* doctrine [20] and also preceded the Supreme Court decisions holding that court enforce-

**16.** Thus the rule against asserting third party's constitutional rights has been relaxed when those rights would be "diluted or adversely affected" if the constitutional challenge should fail and the statute or policy remain in effect pending a challenge by one whose rights are affected. *Craig v. Boren,* 429 U.S. at 195, 97 S.Ct. 451, *quoting Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

**17.** Remedies under the LMRA for breach of the statutory duty of fair representation are discussed at note 33 *infra.* Title VII, 42 U.S.C. § 2000e–2(c) (1976), prohibits a union from discriminating in its membership and prohibits any other form of discrimination that would deprive an employee of employment opportunities or otherwise affect an employee's status. A union that violates these provisions may be enjoined and ordered to take appropriate remedial action. Such suits may be brought by the Equal Employment Opportunity Commission (EEOC) or by a person aggrieved by the union's discriminatory practices. 42 U.S.C. § 2000e–5(f) and (g) (1976).

**18.** Section 11194.3 of the NLRB Case Handling Manual, Pt. II, Representation Proceedings, Oct. 1975 ("Tests for granting or denying inter-

vention") provides, *inter alia:* "Motions to intervene made by 'employees' or 'employees' committees' not purporting to be labor organizations, should be denied." In contrast, any person may file an unfair labor practice charge. *See* NLRB, Rules & Regulations § 102.9, 29 C.F.R. § 102.9 (1977). The complainant is entitled to participate in the unfair labor practice proceeding as a party. *Id.* § 102.8.

**19.** We need not decide whether an individual discriminated against by the union could bring an action in district court challenging the certification under *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). *See* note 6 *supra.*

**20.** The origin of the prudential doctrine of *jus tertii* is not altogether clear, but the first significant elaboration was not until *Tileston v. Ullman,* 318 U.S. 44, 46, 63 S.Ct. 493, 494, 87 L.Ed. 603 (1943). In *Tileston,* the court held that a doctor lacked standing to challenge a Connecticut law prohibiting the use of contraceptives or giving assistance in their use because there was "no basis on which we can say that he has standing to secure an adjudication of his patient's constitutional rights to life, which they

ment of private discrimination constitutes state action in violation of the Fourteenth Amendment.[21]

## B. *Section 9(c)(1) of the LMRA*

■ Section 9(c)(1) of the LMRA provides, *inter alia:* "If the Board finds . . [that] a question of representation exists, it *shall* direct an election by secret ballot and *shall* certify the results thereof."[22] Although, by its terms, § 9(c)(1) is mandatory, the Board may nonetheless deny certification to a victorious union in certain limited circumstances. The Board most often exercises this authority to deny certification when the electoral process itself is tainted.[23] The Board may also decline to certify a union that has interests that conflict with those of the employees in the unit the union seeks to represent.[24] These decisions illustrate that the mandatory language of § 9(c)(1) has been, and must be read in harmony with the basic purposes of the LMRA. Where certification would be inconsistent with the dominant purposes of the Act, the Board has the discretion to deny it, despite the union's electoral victory.[25]

Although the statute does not in all cases require certification of a union chosen in an

do not assert on their own behalf." *Id. Tileston* may also be read, however, as denying standing to assert *jus tertii* only because the physician himself failed to allege any injury in fact. *See* Note, *supra* note 13 at 430 and n.44.

Only with *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), was there an explicit recognition of the prudential nature of the *jus tertii* rule, applicable even where the plaintiff establishes injury in fact. Although the Court in *Barrows* cited Justice Brandeis' elaboration of the "passive virtues" in *Ashwander v. T.V.A.,* 297 U.S. 288, 346-348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis J., concurring), the prudential doctrine of *jus tertii* elaborated in *Barrows* is not included in Justice Brandeis' exposition. The only discussion of standing to assert *jus tertii* in *Ashwander* is in connection with cases where the plaintiffs alleged no injury in fact. *Id.* at 348, 56 S.Ct. 466.

21. *See, e. g., Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed.2d 1586 (1953); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *cf. Hurd v. Hodge,* 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). The fact that *Virginian Railway* was cited with apparent approval in *Moose Lodge,* 407 U.S. at 166, 92 S.Ct. 1965, does not require a different result, since in *Moose Lodge* there was no barrier to assertion of the constitutional right by one actually discriminated against.

22. 29 U.S.C. § 159(c)(1) (1976) (emphasis added). The provisions of § 9(c)(1) were added by the Taft-Hartley Amendments of 1947, 61 Stat. 143 (1947). The requirement that the Board "shall certify" election results was approved in both the House and Senate versions and was adopted without debate or comment.

Prior to 1947, the Board was given much broader discretion in deciding whether to certify a union on the basis of election results. The Wagner Act, 49 Stat. 453 (1935) provided, *inter alia:*

"Whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. In any such investigation, the Board shall provide for an appropriate hearing upon due notice, either in conjunction with a proceeding under section 10 or otherwise, and *may* take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives." (Emphasis added.)
The decision to hold an election, and to utilize the results of such an election were discretionary with the Board. *See Inland Empire Council v. Millis,* 325 U.S. 697, 706-707, 65 S.Ct. 1316, 1321, 89 L.Ed. 1877 (1945).

23. *Great Atlantic and Pacific Tea Co.,* 101 NLRB 1118, 1120 (1952). Refusal to certify when there are serious flaws in the electoral process is consistent with the primary purpose of the electoral machinery established by § 9, namely, to determine the true wishes of a majority in the unit. *See NLRB v. A. J. Tower Co.,* 329 U.S. 324, 330-31, 67 S.Ct. 324, 91 L.Ed. 322 (1946) (decided under the Wagner Act). In *Handy Andy* the Board recognized that denying certification to a victorious union is appropriate when necessary to protect the Board's processes. 228 N.L.R.B. at 454.

24. *R & M Kaufmann v. NLRB,* 471 F.2d 301 (7th Cir. 1972), *cert. denied,* 411 U.S. 906, 93 S.Ct. 1529, 36 L.Ed.2d 195 (1973); *NLRB v. David Buttrick Co.,* 361 F.2d 300 (1st Cir. 1966). *See Bausch & Lomb Optical Co.,* 108 N.L.R.B. 1555 (1954); *Bambury Fashions, Inc.,* 179 N.L.R.B. 447 (1969). *See generally,* Meltzer, *supra* note 1 at 11 n.58.

25. It is a "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Holy Trinity Church v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226.

election by a majority of employees, the purpose of §§ 7 & 9 of the LMRA, facilitating employee self-determination, is best served by giving broad effect to employees' choice of a collective bargaining representative. To promote this policy, Congress has given the NLRB authority to conduct elections and to assure the prompt resolution of disputes concerning representation. Congress' concern that representation questions be resolved speedily is reflected prominently in its decision to limit direct judicial review of the Board's decisions in representation proceedings.[26] Permitting an employer to inject allegations of discrimination into a representation proceeding would tend to undermine this purpose of the Act. Often an employer's allegations will require the Board to conduct extensive investigations.[27] While these inquiries are carried out, the employees' choice of a representative is thwarted, and the delay may prove an effective tactic for eroding the union's support in the unit.[28] Moreover, industrial strife may be exacerbated by inducing unions to forego the Board's electoral machinery in favor of recognitional picketing and other forms of economic pressure.

A refusal to certify a union chosen by a majority in the unit thus can be justified only in the most compelling circumstances, when certification would conflict with other significant goals of the Act. In this case Bell & Howell argues that the vital national commitment to eradicate employment discrimination justifies denying certification to Local 399.

■ Although other federal agencies have primary responsibilities for carrying out the national anti-discrimination policy, Bell & Howell correctly observes that the Board too has a role in promoting this goal.[29] The Board already implements this policy as an aspect of enforcing the union's statutory duty of fair representation.[30] A

That principle has particular application in the construction of labor legislation. . . . *National Woodwork Manufacturers Ass'n v. NLRB,* 386 U.S. 612, 619, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

26. The legislative history is reviewed in *Leedom v. Kyne,* 358 U.S. at 191 194, 79 S.Ct. 180 (Brennan, J., dissenting). *See* notes 6 and 19 *supra.*

27. Professor Meltzer observes that claims of discrimination are likely to pose "complex and time consuming issues," because in most instances Title VII has eliminated the more obvious and explicit forms of discrimination, such as discriminatory union constitutions or collective bargaining agreements. Meltzer, *supra* note 1 at 14.

28. *See* Meltzer, *supra* note 1 at 15. *Cf.* M. Sovern, Legal Restraints of Racial Discrimination In Employment, Ch. 6 at 159 (1966).

29. Plainly, national labor policy embodies the principles of nondiscrimination as a matter of highest priority, *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, [94 S.Ct. 1011, 39 L.Ed.2d 147] (1974), and it is a commonplace that we must construe the NLRA in light of the broad national labor policy of which it is a part. *Emporium Capwell Co. v. Western Addition Community Organization,* 420 U.S. 50, 66, 95 S.Ct. 977, 986, 43 L.Ed.2d 12 (1975).

In *NAACP v. FPC,* 425 U.S. 662, 665, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), the Court indicated that an agency's responsibility to carry out the national policy against invidious discrimination must be determined in light of the purposes underlying the creation of the agency. The primary purpose of the LMRA was not, and is not, the eradication of discrimination in employment. *See* Axelrod & Kaufman, *supra* note 1 at 682–688 (discussing legislative history); *compare* Title VII, 42 U.S.C. § 2000e (1976).

However, in prohibiting union discrimination or union induced employer discrimination, the Act clearly reflects a concern that unions not use their power of exclusive representation to shut individuals out of the workplace based upon race or sex. Thus, while not a dominant purpose of the LMRA, the Board's role in combatting union discrimination is far greater than the role assigned to the Federal Power Commission (now the Federal Energy Regulatory Commission).

30. The Court first recognized the statutory duty of fair representation under the Railway Labor Act in *Steele v. Louisville & Nashville R. R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), but the doctrine was soon applied to the NLRB. *See Wallace Co. v. NLRB,* 323 U.S. 248, 255 56, 65 S.Ct. 238, 89 L.Ed. 216 (1944); *Syres v. Oil Workers Local 23,* 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1956), *rev'g per curiam,* 223 F.2d 739 (5th Cir. 1955). In its most general terms the duty of fair representation requires an exclusive bargaining representative to bargain in good faith for the interest of all the members of the unit. *Humphrey v. Moore,*

union violates its duty of fair representation when it takes advantage of its monopoly position as exclusive bargaining representative to discriminate invidiously against employees or potential employees on the basis of race or sex.[31]  Breach of this duty may violate §§ 8(b)(1)(A), b(2) and b(3) of the act,[32] and subjects the offending union to Board-imposed sanctions [33] as well as private causes of action.[34]

It is by no means certain that the interpretation of the LMRA urged by Bell & Howell would substantially further anti-discrimination goals in a manner consistent with the other policies of the LMRA.[35] First, denying certification or withholding a bargaining order from a discriminatory union may be an ineffective remedy for union discrimination.  These sanctions will have no effect on unions that are strong enough to establish collective bargaining relation-ships with employers without recourse to the Board.

Second, these sanctions are at odds with the remedial focus of the Board's authority.[36]  At best, denying certification or withholding a bargaining order will prevent future discrimination in the unit that the union seeks to represent.  That sanction provides no remedy for those who are already victims of the union's discrimination.  Yet, it is well settled that the Board's principal remedial power is to "make whole" employees who have been injured by violations of the LMRA.[37]

Finally, to give the Board responsibility for investigating allegations of past union discrimination that occurred outside the unit for which the union seeks certification would unnecessarily duplicate the functions of the EEOC.  The broader scope of the

375 U.S. 335, 342, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).  See H. Wellington, Labor and the Legal Process 129–84 (1968); M. Sovern, supra note 28 at 143–75.

**31.**  Syres v. Oil Workers Local 23, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955) (racial discrimination); Peterson v. Rath Packing Co., 461 F.2d 312 (8th Cir. 1972) (sex discrimination).

**32.**  29 U.S.C. §§ 158(b)(1)(A), (b)(2) and (b)(3) (1976).  See Miranda Fuel Co., 140 N.L.R.B. 181, 185–87 (1962), enforcement denied, 326 F.2d 172 (2nd Cir. 1963); Independent Metal Workers (Hughes Tool Co.), 147 N.L.R.B. 1573 (1964).  This circuit has held that breach of the duty of fair representation violates § 8(b)(1)(A). Truck Drivers Local 568 v. NLRB, 126 U.S.App. D.C. 360, 379 F.2d 137 (1967); see also Local 12, Rubber Workers v. NLRB, 368 F.2d 12 (5th Cir. 1966), enforcing 150 N.L.R.B. 312 (1964), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967).  Employer participation in union discrimination may also be an unfair labor practice.  Miranda Fuel Co., 140 N.L.R.B. at 185–186.

**33.**  A union that violates the duty of fair representation may be decertified.  Hughes Tool Co., 104 N.L.R.B. 318, 325–29 (1953); Pioneer Bus Co., 140 N.L.R.B. 54–55 (1962); Local 1, Independent Metal Workers (Hughes Tool Co.), 147 N.L.R.B. 1573 (1964).  The union may also be subject to a cease and desist order for committing an unfair labor practice.  Miranda Fuel Co., 140 N.L.R.B. 181; United Rubber Workers v. NLRB, 368 F.2d at 24.

**34.**  Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).  In Vaca the Court assumed, but did not decide, that breach of the duty of fair representation is an unfair labor practice.  Id. at 186, 87 S.Ct. 903.

**35.**  Here, as in Emporium Capwell, we are asked to interpret the Act to provide "a right to short-circuit orderly, established processes for eliminating discrimination in employment . . . ."  420 U.S. at 70, 95 S.Ct. at 989.  The efficacy of the proposed remedy is thus relevant to interpreting the statute.  Id. at 66–69, 95 S.Ct. 977.

**36.**  The Board's powers are remedial, not punitive, and the Board may not justify an order solely on the ground that it will deter future violations of the Act.  Republic Steel Co. v. NLRB, 311 U.S. 7, 12, 61 S.Ct. 77, 85 L.Ed. 6 (1940).

The Board has broad discretion to adapt its remedies to the needs of particular situations so that "the victims of discrimination" may be treated fairly.  But the power of the Board "to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act."

Local 60, United Brotherhood of Carpenters v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961) (citations omitted).

**37.**  Republic Steel, 311 U.S. at 10–12, 61 S.Ct. 77.

EEOC's investigative and remedial authority, its expertise in detecting subtle and complex forms of discrimination, and its single-purpose anti-discrimination mission combine to make the EEOC a preferable vehicle for eliminating union discrimination.[38]

In contrast to denial of certification before the union becomes exclusive bargaining representative, sanctions based on violations of the duty of fair representation are more likely to be effective in providing a remedy for victims of discrimination, in a manner more consonant with the other underlying policies of the LMRA. The duty of fair representation applies to all exclusive bargaining representatives, not simply to those who use the Board's electoral or remedial machinery. Complaints that the union has violated its duty of fair representation are more likely to be brought by the individuals who are the victims of discrimination. This appropriately focuses the Board's inquiry on the union's conduct in a particular bargaining unit, easing the Board's fact-finding activities. When the complaint is brought by a victim of discrimination, the Board can tailor its order to redress specific instances of discrimination, making the victims whole, and, at the same time, providing more protection for the employees' right of self-determination.[39] If remedies for discrimination are imposed only after the collective bargaining relationship is established, the employer cannot use allegations of discrimination as a pretext to frustrate or delay the employees' right to select their representative.

■ In sum, we conclude that nothing in the LMRA, interpreted in light of the purposes of the Act, requires the NLRB to consider allegations of discrimination prior to certifying a victorious union, at least where the proffered evidence of discrimination relates to past union misconduct outside the bargaining unit that the union seeks to represent.[40]

## C. Constitutional Requirements

Bell & Howell argues that granting exclusive bargaining representative status to

---

**38.** See Note, *The Impact of De Facto Discrimination, supra* note 1 at 1384 85.

**39.** As Member Walther observed in *Murcel Manufacturing Co.*, 231 N.L.R.B. No. 80, 97 L.R.R.M. 153, 154 (1977) (one of the companion cases to *Bell & Howell*)

[A]n 8(b)(1)(A) proceeding allows for the tailoring of a remedy to fit the nature of the discrimination found. The withholding of an otherwise appropriate 8(a)(5) remedial bargaining order is a relatively drastic remedy which completely precludes the establishment of a bargaining relationship. . .

Proceedings under Section 8(b), on the other hand, offer an opportunity to inject some remedial sensitivity into this area. In many situations a cease-and-desist order coupled with an affirmative make-whole obligation will provide a completely adequate remedy. In cases where the discrimination is more pervasive, a revocation of the union's certification may well be the only appropriate remedy. The point is, however, that this flexibility can only be attained through an 8(b) proceeding.

In *Murcel* the Board declined to entertain allegations of union race and sex discrimination as a defense to a § 8(a)(5) charge against the employer.

**40.** In *NLRB v. Sumter Plywood*, 535 F.2d 917, 931 (5th Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977) the court indicated that it would deny enforcement of a bargaining order on behalf of an allegedly discriminatory union "only when the employer has proffered specific evidence sufficient to demonstrate a pattern of racially discriminatory behavior by the Union which would support a finding of a *definite propensity* for racially unfair representation." (Emphasis added.) In that case the employer offered evidence of a racially oriented campaign that excluded almost all whites. The Board declined to consider that evidence as a justification for the employer's refusal to bargain. The court affirmed, holding that the employer failed to establish a prima facie case that would warrant a hearing. *See also NLRB v. Bancroft Manufacturing Co.*, 516 F.2d 436, 446–47 (5th Cir. 1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976) (employer not entitled to hearing where the employer offered no evidence of discrimination by the local union in question).

The approach in *Sumter Plywood* is not necessarily inconsistent with that which we adopt today, since we do not decide whether the Board could constitutionally exclude evidence that establishes the union's intention to discriminate *in the future* in the unit for which the union seeks certification. *See* note 46, *infra*.

a union that discriminates against women violates the Fifth Amendment, and urges that we interpret the Act to avoid what Bell & Howell views as an unconstitutional result.[41] We reject this argument, concluding that at least under the facts of this case, the Board's decision not to inquire further into Bell & Howell's allegations does not violate the Fifth Amendment.

▮ It is clear that the Fifth Amendment's proscription[42] is not limited to discrimination initiated by the government. Governmental actions which "authorize" or "encourage" private discrimination are equally proscribed. *Reitman v. Mulkey,* 387 U.S. 369, 375–76, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). Indeed, where the state is "significantly involved" with invidious discrimination, that discrimination comes within the ban of the Fifth Amendment. *Id.* at 380, 87 S.Ct. 1627, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

These same cases establish that the Board's actions here do not constitute authorization or encouragement of discrimination. In *Burton,* the public Parking Authority violated the Fourteenth Amendment *not* by leasing to a restaurant owner

who had discriminated in the past, but rather by its failure to "affirmatively require[] [the restaurant] to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation." *Id.* at 725, 81 S.Ct. at 861. Moreover, the restaurant owner became bound not to discriminate only *after* he became "significantly involved" with the public Authority.

▮ Here the effect of certification is to achieve precisely what was lacking in *Burton,* the imposition of an affirmative obligation on the private association not to discriminate. Far from authorizing and encouraging discrimination, certification subjects the union to additional sanctions for any future discrimination.[43]

The Board's decision to address claims of discrimination after certification thus seems to accord well with the relevant constitutional considerations. Once certified, a union is invested with significant governmental powers,[44] and passive acquiescence by the Board in union discrimination might well pose serious constitutional questions. Both the Court and the Board have avoided these difficulties by interpreting the Act to prohibit such discrimination,[45] and by pro-

**41.** This is the approach adopted by the Eighth Circuit in *Mansion House. See* note 1 *supra.*

**42.** The Fifth Amendment proscribes discrimination at least insofar as the discrimination is "so unjustifiable as to be violative of due process." *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). *See Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964). In light of our disposition of this case, we have no occasion to decide whether the Fifth Amendment creates a different standard for classifications based on sex than for those based on race, or national origin.

**43.** These sanctions apply not only to unions that are certified under § 9(c), but more generally to any union that is recognized as an exclusive bargaining representative. *See — · - —* of 194 U.S.App.D.C., 145 147 of 598 F.2d.

**44.** "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents." *Steele v. Louisville & Nashville R. R. Co.,* 323 U.S. at 202, 65 S.Ct. at 232. Certifi-

cation provides a union with several benefits in addition to the right to act as the exclusive representative. Under the one year rule the employer is obligated to bargain with the union elected by the unit for one year after the election, during which time no rival union may file for an election in the unit. *Brooks v. NLRB,* 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125 (1954). The contract bar rule extends the protection against challenges by a rival union for the life of a collective bargaining agreement up to a maximum of three years. *General Cable Co.,* 139 N.L.R.B. 1123 (1962); *Deluxe Metal Furniture Co.,* 121 N.L.R.B. 995, 998–1004 (1958). The Board has indicated that it will deny the benefit of the contract bar rule to a racially discriminating union. *Pioneer Bus Co.,* 140 N.L.R.B. 54, 55 (1962); *cf. Pittsburgh Plate Glass Co.,* 111 N.L.R.B. 1210, 1213 (1955). However, this sanction appears applicable only when the unlawful discrimination appears on the face of the contract. *See St. Louis Cordage Mills,* 168 N.L.R.B. 135 (1967).

**45.** *See Steele v. Louisville & Nashville R. R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). *Cf. id.* at 208 09, 65 S.Ct. 226 (Murphy, J.,

viding a wide variety of sanctions to enforce the prohibition.

Thus, when the only evidence of discrimination proffered is evidence of a union's past discrimination outside the unit in question, the NLRB does not violate the Fifth Amendment by extending certification to the union without an inquiry into the alleged discrimination.[46]

concurring) (concluding that discrimination by a union that is an exclusive bargaining agent would violate the Fifth Amendment).

46. We do not decide at this time whether a different result is required where the union's constitution or by-laws, or explicit conduct in a representation election, establish that the union will discriminate in the unit in question. *See Handy Andy*, 228 N.L.R.B. at 467 (Member Walther, concurring):

My colleagues in the majority note that "we have and will continue to consider [in a representation proceeding] the impact of unlawful discrimination where such consideration is required to preserve the integrity of the Board's own processes." To the instances which they cite, I would add yet another: instances in which it can be established through reference to a petitioner's constitution, bylaws, or other written statement of policy, that the petitioner—not an affiliated organization or sister local—restricts access to membership on the basis of race, alienage, national origin, or sex. Should such discrimination be found, I would disqualify the petitioner from access to our election machinery until it can establish that the offensive practices have been eliminated.

*See also Bell & Howell*, 230 N.L.R.B. at 424 (Member Walther, concurring).

The Board has left open the possibility that in appropriate cases it can and will consider this evidence, *see Handy Andy*, 228 N.L.R.B. at 454, and nothing in our opinion decides that the NLRB is precluded from considering such evidence. *See* § II, B, *supra*. Bell & Howell has not alleged that the local's by-laws exclude women, nor that the union in its campaign promised to discriminate if selected as exclusive bargaining representative. The only evidence of discrimination cited by Bell & Howell in Local 399's governing instruments is the provision of maternity benefits to "dependent wives" but not "female employees," and the provision of a death benefit to "widows" but not "widowers."

Bell & Howell offered no evidence that "widowers" or "female employees" had or would in fact be denied such benefits discriminatorily (though such a showing would presumably be difficult if in fact the union has no female

## III. DENIAL OF A FAIR HEARING

Bell & Howell also contends that certain evidentiary rulings, limiting the company's right to present evidence on the *Mallinckrodt* factors, deprived the company of a fair hearing.[47] The *Mallinckrodt* factors are primarily concerned with the appropriateness of carving out a unit of craft workers from a previously established, collective bargaining unit.[48] Their rele-

employees). It may be that the provisions of the benefit plans would be interpreted in a neutral fashion. In any event, the Board provides adequate opportunities to challenge these provisions after certification (as well as through the Civil Rights Act), if the union in fact discriminates in the provision of benefits.

47. Specifically, Bell & Howell objects to

1) The Regional Director's decision to limit the reopened hearing to two of the *Mallinckrodt* factors;

2) The Hearing Officer's limitation of the cross-examination of Local 399's President, Mr. Wren;

3) The Regional Director's finding that producing a sample of Local 399's contracts constituted sufficient compliance with Bell & Howell's subpoena.

Taken together, Bell & Howell argues that these rulings prevented it from producing relevant evidence in the representation proceeding and therefore denied it due process.

48. In *Mallinckrodt*, 162 N.L.R.B. at 197, the Board enumerated six factors that it deemed relevant to determining whether a craft unit should be severed from a broader bargaining unit:

1. Whether or not the proposed unit consists of a distinct and homogeneous group of skilled journeymen craftsmen performing the functions of their craft on a non repetitive basis, or of employees constituting a functionally distinct department, working in trades or occupations for which a tradition of separate representation exists.

2. The history of collective bargaining of the employees sought and at the plant involved, and at other plants of the employer, with emphasis on whether the existing patterns of bargaining are productive of stability in labor relations, and whether such stability will be unduly disrupted by the destruction of the existing patterns of representation.

3. The extent to which the employees in the proposed unit have established and maintained their separate identity during the period of inclusion in a broader unit, and the extent of their participation or lack of participation in the establishment and maintenance of the existing pattern of representation and

vance is diminished where, as here, there is no previous history of collective bargaining on a broader basis. The Regional Director's decision to reopen the hearing permitted the company to present evidence on two of the factors,[49] and the third factor is irrelevant in the absence of a prior history of collective bargaining. Moreover, Bell & Howell has failed to allege or prove any

the prior opportunities, if any, afforded them to obtain separate representation.

4. The history and pattern of collective bargaining in the industry involved.

5. The degree of integration of the employer's production processes, including the extent to which the continued normal operation of the production processes is dependent upon the performance of the assigned functions of the employees in the proposed unit.

6. The qualifications of the union seeking to "carve out" a separate unit, including that Union's experience in representing employees like those involved in the severance action.

**49.** See note 4, *supra.* Bell & Howell also sought to introduce evidence on the second factor listed in *Mallinckrodt, see* note 48, *supra.* That factor is plainly irrelevant where is no history of bargaining on a broader basis. Bell & Howell implicitly recognizes this fact, and attempts to recast the second factor as "the effect which a separate unit would have on the stability of the employer's industrial relations." J.A. 53. This characterization misconceives the point of the *Mallinckrodt* factors, which are concerned with the harms and benefits of carving out a separate group as that decision affects employees, not employers.

**50.** 3. The employer believes that the subpoenaed documents, together with the testimony of Petitioner's President, Richard T. Wren, will prove that separate units of the type of employees involved in the unit here petitioned for are not the area and industry practice. Specifically, the Employer believes that the evidence will show that

(a) at some locations where Petitioner represents stationary engineers, the overall groups of powerhouse or boiler room employees are divided into two collective bargaining units, one represented by Petitioner and the other represented by Local 7, International Brotherhood of Firemen and Oilers.

(b) at some locations where Petitioner represents stationary engineers, the represented employees perform no work on air conditioning equipment, and this work is performed by employees represented by another labor organization or by unrepresented employees.

(c) at some locations where Petitioner represents stationary engineers, Petitioner also

prejudice from the evidentiary rulings. Specifically, Bell & Howell does not allege that Local 399 lacks history, practice and experience in representing employees like those at Lincolnwood, nor that the area and industry practice does not include separate units such as that at Lincolnwood. Rather, the employer offered to prove only that different representation patterns prevail at some locations.[50] The Regional Director

represents as part of the same unit employees performing other maintenance functions. J.A. 68 69. In his Decision and Direction of Election, the Regional Director observed (J.A. 76 77):

The Employer contends that the record is incomplete with regard to evidence bearing on Petitioner's history, practice and experience in representing the type of employees in the unit sought; the area and industry practice regarding the representation of the type of employees in the unit sought; and the effect that a separate stationary engineers unit would have on the Employer's industrial relations. On the basis of the entire record, it is the opinion of the undersigned, and I find that there is sufficient evidence in the record to make a determination appropriately taking into account the factors that the Employer suggests are missing.

. . . Various types of employers employ stationary engineers represented by the Petitioner, to wit; a building managers association, a hotel association, individual laundries, shopping centers, office complexes, numerous industries, hospitals, and governmental units. 20 to 25 percent of Petitioner's members are engaged in manufacturing of production concerns, the record indicates that duties Petitioner's members perform at various laundry and manufacturing concerns are similar in nature to those duties performed by the employees in the unit sought. The record also indicates that employees performing duties similar in nature to those in the unit sought are represented by other unions on a plant-wide basis without adverse effects on industrial relations.

\* \* \* \* \* \*

Upon examining the record as a whole and weighing all relevant evidence and factors, I find that since the stationary engineers work in the boilerroom which is separated from the rest of the facility by a locked door, work 24 hours—7 days a week regularly, are required to have experience and training, perform the same type of work often called "powerhouse" work, have separate seniority rights apart from the rest of the maintenance employees, have their own day to day supervisor, perform work in the boilerroom of a type which is rarely, if ever done by other

also recognized the mixed pattern of representation and Bell & Howell does not contend that the finding was erroneous. Therefore we conclude that Bell & Howell was provided an ample opportunity to present relevant evidence on the appropriateness of the Unit that Local 399 sought to represent.

## IV. CONCLUSION

We conclude that the Board properly certified Local 399 as the collective bargaining representative for Bell & Howell's stationary engineers and that Bell & Howell was therefore obligated to bargain in good faith with the union. Accordingly, the decision of the Board, holding that Bell & Howell's refusal to bargain with Local 399 violated §§ 8(a)(5) and (1) of the LMRA is

*Affirmed.*

employees, spend a substantial period of time in the boilerroom apart from the maintenance and production workers, have their own locker and washroom facilities, generally have lunch away from other employees, and further since Petitioner represents and has represented employees performing similar duties in similar operations in the area, I find the stationary engineers to be an appropriate unit. . . .