646 F.2d 616
 106 L.R.R.M. (BNA) 2573, 71 A.L.R.Fed. 593,
207 U.S.App.D.C. 281, 90 Lab.Cas. P 12,590
 UNITED STEELWORKERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Florida Steel Corporation, Intervenor.
FLORIDA STEEL CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Steelworkers of America, Intervenor.
 Nos. 79-1943, 79-2242.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 22, 1980.
Decided Feb. 25, 1981.
 
 Jeffrey L. Gibbs, Washington, D. C., with whom Elliot Bredhoff, Washington, D. C., was on brief, for petitioner in 79-1943 and intervenor in 79-2242.
 Charles F. Henley, Jr., Jacksonville, Fla., for petitioner in 79-2242 and intervenor in 79-1943.
 Jolane Findley, Atty., N. L. R. B., Washington, D. C., with whom Elliott Moore, Associate Gen. Counsel, and Carol A. DeDeo, Atty., N. L. R. B., Washington, D. C., were on brief, for respondent.
 Before Senior Circuit Judge BAZELON and Circuit Judges WALD and EDWARDS.
 Opinion for the court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case raises significant questions concerning the remedial authority of the National Labor Relations Board (the "Board" or "NLRB"). In this action the Board found, and it is not here disputed, that Florida Steel Corporation violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 151-69 (the "Act"), by unilaterally changing the pay rate of two employees recalled from layoff. Given the company's "proclivity to disregard the statutory rights of its employees and their chosen bargaining representatives," the Board ordered extraordinary affirmative relief beyond the traditional "cease and desist" and "make whole" orders imposed for violations of this type. Most significantly, the Board's remedial order includes provisions requiring Florida Steel to grant the United Steelworkers of America certain forms of access to all company plants, including unorganized plants that have not been the site of any union activity.
 
 
 2
 Both the employer and the union have filed petitions for review of this order of the Board. The union here contends that, in light of numerous prior instances in which Florida Steel has been found to have violated the Act, certain additional remedies requested by the union should have been ordered by the Board. The employer, on the other hand, argues that the extraordinary remedies imposed by the Board are not warranted by the facts of this case. The Board has filed a cross-application for enforcement of its order.
 
 
 3
 To resolve the questions raised in these petitions, we are forced to consider several fundamental, yet potentially conflicting, principles of labor law. In particular, this case presents troublesome questions concerning the authority of the Board to take affirmative action to remedy violations of the Act, as opposed to the right of an employer to deny a union access to company property during an organizational campaign. For reasons set forth below, we hold that, in appropriate circumstances, the Board has broad authority to grant a union access to company property as part of a remedial order. However, in part due to principles set forth in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), we hold that the Board must make clear that such access is necessary to offset the adverse effects of unlawful employer conduct. Since the Board in this case has not made certain findings that are necessary to justify a corporatewide grant of access in a remedial order, we remand this case to the Board for further consideration and clarification.
 
 I. BACKGROUND
 
 4
 We begin with a brief presentation of the facts of this case. In light of the arguments advanced by the parties, we also review the history of past violations of the National Labor Relations Act by Florida Steel.
 
 A. The Unfair Labor Practice In This Case
 
 5
 The facts underlying this action are not in dispute. The incidents involved here occurred at the Indiantown, Florida plant of Florida Steel. As a result of a representation election conducted in May 1974, the United Steelworkers of America was certified by the Board to represent the production and maintenance workers at the Indiantown plant. In January 1975, Florida Steel effected a cutback in operations that resulted in a layoff of approximately 55 employees at the Indiantown plant. Three months later, Florida Steel recalled 24 of those employees. The finding of an unfair labor practice in this case resulted from the fact that the company recalled two employees to perform work similar to that done before the layoff but at a rate of pay lower than that held prior to layoff; the company effected this change in the employees' rate without first bargaining with the union.[1]
 
 
 6
 Before their layoff, employees McCammon and McDonald performed the duties of "yard helper," a job classification that normally paid $3.50 per hour. Due to problems in recruiting individuals to perform the work of that job classification, McCammon and McDonald were classified before layoff as "billet yard helpers" and paid $3.80 per hour. After their layoff, McCammon and McDonald were recalled and paid as yard helpers, not as billet yard helpers. This post-layoff change in the employees' classification and pay, which resulted from the implementation of a new policy by the company, was made without any negotiation with the union.
 
 
 7
 Upon the filing of charges by the union and the issuance of a complaint by the Regional Director of the Board, an Administrative Law Judge concluded that Florida Steel had an obligation to consult with the union concerning its classification decision with respect to yard helper work.[2] The ALJ concluded, however, that the unfair labor practice charge had not been timely filed by the union, and accordingly recommended that the complaint be dismissed.[3]
 
 
 8
 The Board reversed this decision of the Administrative Law Judge,[4] ruling that the unfair labor practice charge had been timely filed, and that the unilateral change in the pay rate of McCammon and McDonald violated Sections 8(a)(1) and 8(a)(5) of the Act.[5] Pursuant to this ruling, the Board remanded the case to the Administrative Law Judge for consideration of the appropriate remedy.
 
 
 9
 On remand, both the union and the General Counsel requested that "the broadest remedy possible" be imposed against the company. These requests were made in light of the numerous instances in which Florida Steel had been found previously to have violated the Act. The ALJ denied the requests for extraordinary relief.[6] The Administrative Law Judge stated:
 
 
 10
 The violation found by the Board was an isolated one and hardly egregious in the context of the total layoffs and recalls, and, as stated in the original Decision herein, was not accompanied by even an allegation of animus.
 
 
 11
 244 N.L.R.B. No. 61, decision of Administrative Law Judge at 3. The ALJ recommended only the conventional "cease and desist" and "make whole" orders.
 
 
 12
 Exceptions were again filed from the recommended decision of the Administrative Law Judge. In rejecting the limited remedial order proposed by the ALJ,[7] the Board stated that:
 
 
 13
 While the 8(a)(5) violation involved here would not, under ordinary circumstances, appear to justify extraordinary remedies, we have decided to grant certain additional remedies here for the reasons fully explicated in our decision in Florida Steel Corporation, 242 NLRB No. 195 (1979). We indicated there that Respondent's "pattern of unlawful conduct in recent years" had evidenced a "rejection of the principles of collective bargaining." We view this case as a continuation of that rejection. Moreover, in reaching our conclusion, we note that Respondent's unlawful conduct here does not constitute its initial transgression of employee rights at the Indiantown, Florida, facility involved. In a prior Board decision, 220 NLRB 1201 (1975), enfd. 538 F.2d 324 (4th Cir. 1976), the Board found that Respondent had violated Section 8(a)(3) and (1) of the Act by withholding a wage increase in retaliation for its employees' union activities. Accordingly, we believe that extra remedial relief is necessitated by Respondent's proclivity to disregard the statutory rights of its employees and their chosen bargaining representatives.
 
 
 14
 244 N.L.R.B. No. 61 at 2 (footnote omitted).
 
 
 15
 The Board entered an order providing for the following "extra remedial relief": (1) issuance of a corporatewide cease and desist order; (2) corporatewide posting of the Board's notice; (3) mailing of the notice to all employees of Florida Steel; (4) reading of the notice to all employees of Florida Steel; and (5) publication of the notice in all appropriate company publications. The Board decision further provided:
 
 
 16
 In addition, if, within 2 years of the date of this Decision, a Board-conducted election is scheduled at any of Respondent's plants involving the Charging Party (United Steelworkers of America), we will require Respondent to provide access to at least two union representatives for a 30-minute speech during worktime, the date thereof to be not more than 10 working days, but not less than 48 hours, prior to any such election. If within the same 2-year period, any agent of Respondent convenes and addresses employees at any of Respondent's plants concerning union representation, we will require Respondent to provide the Union with equal time to respond to such speeches.
 
 
 17
 244 N.L.R.B. No. 61 at 2-3.
 
 
 18
 The Board refused to grant two additional remedies requested by the union. Believing that the above measures would remedy adequately the unfair labor practice found, the Board denied requests for: (1) union access for one year to plant bulletin boards companywide; and (2) a list of the names and addresses of the employees of Florida Steel on a companywide basis.
 
 
 19
 B. Prior Violations of the Act by Florida Steel
 
 
 20
 The remedial order of the Board at issue in this case was based upon Florida Steel's "pattern of unlawful conduct in recent years." We review briefly, therefore, the history of prior cases involving Florida Steel that have arisen before the National Labor Relations Board.
 
 
 21
 Florida Steel Corporation operates 22 divisions in 11 cities throughout the southeastern United States. By its own admission, Florida Steel is "an enterprise waging a tough, prolonged campaign" against the United Steelworkers. Brief for Petitioner Florida Steel, p. 10. Union organizational activity has been conducted at only four different Florida Steel locations.[8] At each of those locations, the company's "tough, prolonged campaign" against the union has included the commission of several unfair labor practices. In 17 separate cases the Board has found violations of the Act by Florida Steel.[9] Moreover, in most of those cases several unfair labor practices were found.
 
 
 22
 These cases may be placed roughly in several different categories. At each of the four plants where organizational campaigns were conducted, the company violated the Act by withholding wage and fringe benefit improvements from those plants that were granted companywide.[10] The Board found in these cases that, during the course of a union campaign, Florida Steel deliberately withheld customarily granted benefits in order to discriminate against employees at those plants. In addition, the withholding of benefits at one plant (Croft) was widely publicized at another plant (Indiantown) in an attempt to discourage employees at the latter plant from voting for the union.[11] After an unlawful withholding of benefits was found at a fourth plant, the Board ordered the company to cease and desist from the unlawful activity on a corporatewide basis.[12]
 
 
 23
 In another series of cases, Florida Steel violated the Act by threatening, discharging, and conducting unlawful surveillance of known union adherents. In Florida Steel Corp., 214 N.L.R.B. 264 (1974) (Croft), supplemented, 221 N.L.R.B. 1008 (1975), enforced in relevant part, 551 F.2d 306, 94 L.R.R.M. 2589 (4th Cir. 1977), the Board found the following unfair labor practices: the company had made appeals to racial prejudice in an attempt to defeat the union; the company had threatened employees with loss of jobs, plant closure, reduction of overtime, reduction of benefits, and deterioration of working conditions if the union was accepted; the company had unlawfully interrogated employees concerning union sympathies, and spied on union adherents; and the company had unlawfully discharged 11 employees, and suspended one employee, as a result of their support for the union. In Florida Steel Corp., 215 N.L.R.B. 97 (1974) (Tampa), enforced in relevant part, 529 F.2d 1225 (5th Cir. 1976), supplemented, 234 N.L.R.B. 1089, enforced, 586 F.2d 840 (5th Cir. 1978) (table), the Board found that the company had violated the Act by maintaining and enforcing an invalid no-solicitation rule, by interrogating employees with regard to their union memberships and activities, by harassing known union supporters through extensive surveillance, and by discharging two employees because of their union activities. Similar violations were found in four additional cases.[13]
 
 
 24
 In addition, at all four locations where employees attempted to organize and an election was held, the conduct of Florida Steel caused the first election to be set aside or the ballots to be seized.[14] In two re-run elections conducted by the Board, the union was successful in obtaining the support of a majority of the employees and was certified as bargaining representative (Croft and Indiantown).
 
 
 25
 The selection of the union by employees of Florida Steel, however, has not stopped the company's "tough, prolonged campaign" against the union. In a more recent series of cases, the company has attempted to undercut the standing of the union as exclusive bargaining agent by refusing to bargain in violation of Section 8(a)(5). In Florida Steel Corp., 231 N.L.R.B. 923 (1977) (Croft), the Board found that the company unilaterally changed wages, hours, and conditions of employment in violation of Sections 8(a)(1) and 8(a)(5) in prohibiting the continued use of company credit cards, reducing reimbursement rates for meal and lodging expenses, and stating that it would deduct one-half hour pay when meal compensation was provided, all without negotiation with the union. The Board further found a violation of Sections 8(a)(1) and 8(a)(3) when those actions were considered against increases in benefits granted to nonunionized employees at other plants. The Board again noted that the company used the plight of its unionized employees as a warning to employees at an unorganized plant not to select the union.[15] As a result of this use of employees in one plant as an example to employees in another plant, the company was ordered to post a remedial notice at all of its plants and locations.[16]
 
 
 26
 In Florida Steel Corp., 235 N.L.R.B. 941 (1978) (Croft), enforced in relevant part, 601 F.2d 125 (4th Cir. 1979), the Board again found that the company violated Sections 8(a)(1) and 8(a)(5) at the Croft plant by making a unilateral change in working conditions, and, in addition, by failing to provide the union with information necessary for collective bargaining. As in the previous case, the company was ordered to cease and desist the unlawful conduct, and to post the remedial order, on a corporatewide basis.
 
 
 27
 One final case in this series deserves special attention, for the Board order in that case closely parallels the order at issue here. In Florida Steel Corp., 242 N.L.R.B. No. 195 (June 20, 1979) (Croft), enforced in part, 620 F.2d 79 (5th Cir. 1980), the Board found that Florida Steel violated Sections 8(a) (1) and 8(a)(5) of the Act by refusing to give the union information concerning the reinstatement of several employees previously found to have been unlawfully discharged. To remedy this violation, the Board granted a request for extraordinary remedies, stating that such remedies were necessary "in order to fully remedy Respondent's rejection of the principles of collective bargaining as evidenced by its pattern of unlawful conduct in recent years." 242 N.L.R.B. No. 195 at 2. The Board entered a remedial order virtually identical to that at issue in this case.
 
 
 28
 Since the Board in the present case relied heavily on the findings of this earlier decision, it is important to state those findings with some care. After reviewing the many instances of misconduct cited above, including the use by Florida Steel of its unlawful conduct at one plant as a warning to employees at other plants, the Board explained the broad remedial order as follows:
 
 
 29
 Thus, the pattern is clear. Respondent has used unlawful means to oppose employee organizational activity at its Croft, Tampa, Indiantown, and Jacksonville plants. Having failed in its efforts to stifle employee free choice at the Croft and Indiantown plants, Respondent next made the union's victory a hollow one by refusing to bargain concerning basic decisions affecting the working conditions of unit employees. The instant violation is yet another step in what can only be characterized as a corporate campaign to chill employee organizational activity throughout its facilities through unlawful conduct. We therefore deem it essential to grant the Charging Party's request for extraordinary remedies in order to counteract the effects of this campaign of lawlessness.
 
 
 30
 242 N.L.R.B. No. 195 at 4. The Board further noted that "although these remedies might be considered punitive if applied to an isolated instance of misconduct, they are essential to neutralize the effects of Respondent's continuing pattern of unlawful conduct in recent years." Id. at 5.
 
 
 31
 On petition for review, the Fifth Circuit modified the remedial order of the Board. The court held that the Board acted within permissible limits in ordering Florida Steel to give notice by letter, by posting, and by reading that it would not interfere with employee rights protected by Section 7 of the Act. 620 F.2d at 82. In addition, in part because of the company's use of past violations elsewhere in the corporate structure as part of its anti-union campaigns, the court agreed that the notice should be provided to employees at all plants of Florida Steel. Id. Given these broad notice provisions, however, the court held that the additional requirement that notice be placed in appropriate company publications could not be sustained as a remedial measure. Id. at 83.
 
 
 32
 The court also struck down certain portions of the order granting the union access to all plants of Florida Steel. The court held that the provisions for access to the two unionized plants, Croft and Indiantown, could be justified "as a means for deterring any repetition of the conduct before the Board and for preventing other efforts by the company to impair the effectiveness of the union as a bargaining representative." 620 F.2d at 83. With respect to all other plants, the court stated:
 
 
 33
 In requiring this access to be provided at plants where the Steelworkers union is not a bargaining representative, however, the Board's order cannot be viewed as remedial with respect to the charge before it, one involving interference with the union's performance of its role as a bargaining representative.
 
 
 34
 Id. The court thus held that the portion of the order providing access at these other plants, imposed perhaps from the "understandable frustration and impatience" of the Board, could not be sustained. Id.
 
 C. Issues Presented
 
 35
 From the above, it is clear that we are dealing with a relatively minor violation of the Act, committed, however, by an employer apparently dedicated to defeating the union at all costs. As stated at the outset, only the propriety of the Board's remedial order is at issue in this case.
 
 
 36
 The union contends that the Board did not go far enough in its grant of extraordinary remedies, and should have (1) granted the union access to plant bulletin boards companywide for one year and (2) ordered the company to furnish the union with a list of the names and addresses of the employees of Florida Steel on a companywide basis. In support of this request, the union notes an earlier finding of the Board that "it will effectuate the purposes of the Act to require Respondent to provide the Union with companywide access for 1 year to bulletin boards, and furnish the Union with a list of the names and addresses of all employees on a companywide basis." Florida Steel Corp., 233 N.L.R.B. 491 at 491 (1977).[17] The union argues that these remedies are necessary "to insure that all Florida Steel employees are informed of the protection afforded them in order to expunge the coercive effect of earlier company communications to employees concerning various unfair labor practices." Brief of Petitioner United Steelworkers, p. 20 (emphasis in original).
 
 
 37
 In contrast, the company argues that the Board went too far; the company contends that the order of the Board is not supported by substantial evidence in the record and should not be enforced by this court. Florida Steel asserts that the remedies imposed by the Board far exceed that which is appropriate based on an objective examination of the company's record, and are punitive in nature and therefore improper.[18] In particular, the company argues that the access requirements, like the employee name and address list, are essentially organizational tools for the union, appropriate only if "consistent with the principles set forth in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956) which require a showing of special need for increased access in order to effectuate the purposes of the Act." Brief of Petitioner Florida Steel, p. 8.
 
 
 38
 The resolution of these competing claims requires a careful examination of general principles governing the purpose and proper scope of remedial action taken by the National Labor Relations Board. We agree with Florida Steel that certain aspects of the Board order at issue here raise important questions concerning the proper relationship between remedial action that may be taken by the Board and other principles that normally govern the conduct of an organizational campaign. In particular, we must consider whether the principles announced in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), have any effect on a remedial grant of access to a union on a corporatewide basis at unorganized plants.
 
 
 39
 We turn then to consider these potentially conflicting areas of the law. First, in part II of the opinion, we examine restrictions placed by the Supreme Court on union access to company property during an organizational campaign. Second, in part III, we set forth principles governing remedies under the National Labor Relations Act, including a survey of recent developments with respect to the use of union access as a remedial measure. In part IV of the opinion, we set forth the appropriate principles to be applied in cases involving "union access" as a remedial measure. Finally, in part V, we apply these principles to the remedial order at issue in this case.
 
 
 40
 II. PERMISSIBLE RESTRICTIONS ON UNION ACCESS TO COMPANY
 
 PROPERTY DURING AN ORGANIZATIONAL CAMPAIGN
 
 41
 The principles governing union rights of access to company property are among the most fundamental of labor law. Access can be an extremely valuable organizational tool. One empirical study has found that those employees who switch from a pro-company to a pro-union position during an organizational drive are more likely to be familiar with the content of a union campaign than those employees who do not switch. Getman and Goldberg, The Behavioral Assumptions Underlying NLRB Regulation of Campaign Misrepresentations: An Empirical Evaluation, 28 Stan.L.Rev. 263, 281 (1976). Thus, a union organizational drive may be facilitated by access to a company plant during the course of an election campaign.
 
 
 42
 At the same time, union access by definition impacts on the private property rights of an employer. In NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), the Supreme Court recognized these competing forces and established rules governing rights of access of nonemployee union organizers to the private property of an employer.
 
 
 43
 At issue in Babcock was the legality of a rule promulgated by an employer that prohibited the distribution of literature by nonemployee union organizers on company-owned parking lots. The plant in Babcock was located in a community of 21,000 people. Approximately 40% of the employees lived within the community, with the remainder located within a 30-mile radius. The only public area in the immediate vicinity of the plant was an area where the driveway to the plant met a public right-of-way; because of traffic conditions, however, union solicitation could not be conducted safely at that spot.
 
 
 44
 Concerning the right to solicit union support on company property, the Supreme Court noted that a distinction "of substance" existed between rules applicable to employees and those applicable to nonemployees. The Court recognized, as earlier established in Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), that no restriction could be placed on the right of employees to discuss unionization among themselves on company property, unless the employer could demonstrate that a restriction was necessary to maintain production or discipline in the plant. Unlike employees, however, outside union organizers have no preexisting right to be present on the property of the employer. As a result, the Court held in Babcock that an accommodation was required to be made between the organizational interests of employees and the private property interests of an employer. As described by the Supreme Court:
 
 
 45
 Organization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other.
 
 
 46
 351 U.S. at 112, 76 S.Ct. at 684.
 
 
 47
 The Supreme Court in Babcock set forth specifically the manner in which the accommodation between organizational rights and property rights was to be made. The Court held:It is our judgment that an employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution.
 
 
 48
 351 U.S. at 112, 76 S.Ct. at 684. Stated alternatively, "if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property." Id. at 113, 76 S.Ct. at 685.
 
 
 49
 Applying this standard, the Court in Babcock denied the union access to company property, finding that other means of communication were readily available by which the union could deliver its message to employees. 351 U.S. at 113-14, 76 S.Ct. at 684-85. Since the issuance of the decision in Babcock, unions rarely have been granted access to company property during organizational campaigns.[19] Indeed, the Supreme Court itself has recently recognized that "the balance struck by the Board and the courts under the Babcock accommodation principle has rarely been in favor of trespassory organizational activity." Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 205, 98 S.Ct. 1745, 1761, 56 L.Ed.2d 209 (1978).[20]
 
 
 50
 The restrictions against union access during organizational drives announced in Babcock have held firm in a number of different contexts. One of the most important applications of Babcock occurred just two years later in NLRB v. United Steelworkers (NuTone), 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958). In NuTone, two cases were consolidated. In the first case, the employer enforced a no-solicitation rule against employee solicitation valid under Republic Aviation (because necessary to maintain plant production or discipline), but at the same time engaged in noncoercive, anti-union solicitation while committing other unfair labor practices. The facts of the second case were identical, except that the employer anti-union solicitation in that case was itself coercive and thus a violation of the Act. The issue presented in NuTone was whether the existence of anti-union solicitation by an employer particularly if coercive or accompanied by other unfair labor practices had any effect on employee rights of solicitation or union rights of access as set forth in Republic Aviation and Babcock.
 
 
 51
 The Supreme Court ruled in NuTone that the existence of anti-union solicitation by an employer or other unfair labor practices did not nullify the Republic Aviation and Babcock standards. As stated by the Supreme Court:
 
 
 52
 No attempt was made in either of these cases to make a showing that the no-solicitation rules truly diminished the ability of the labor organizations involved to carry their messages to the employees. Just as that is a vital consideration in determining the validity of a no-solicitation rule, see Republic Aviation Corp. v. Labor Board, supra, at 797-798 (65 S.Ct. at 985); Labor Board v. Babcock & Wilcox Co., supra, at 112 (76 S.Ct. at 684), it is highly relevant in determining whether a valid rule has been fairly applied.
 
 
 53
 357 U.S. at 363, 78 S.Ct. at 1271. The Court further stated:If, by virtue of the location of the plant and of the facilities and resources available to the union, the opportunities for effectively reaching the employees with a pro-union message, in spite of a no-solicitation rule, are at least as great as the employer's ability to promote the legally authorized expression of his anti-union views, there is no basis for invalidating these "otherwise valid" rules.
 
 Id. at 364, 78 S.Ct. at 1272.[21]
 
 54
 Babcock also served as a basis for the resolution of a controversy concerning union rights to access to respond to a "captive audience" speech of an employer. In Bonwit Teller, Inc., 96 N.L.R.B. 608 (1951), the Board considered a case in which an employer had assembled workers on company premises during working time to deliver an anti-union message one week before an election. The company then refused to grant the union an opportunity to address the employees under similar conditions. The Board held that the employer's refusal to grant the union "equal time" violated Section 8(a)(1) of the Act. Enforcement was denied by the Second Circuit, however, because the court found that the Board's order was overly broad. Bonwit Teller, Inc. v. NLRB, 197 F.2d 640 (2d Cir. 1952), cert. denied, 345 U.S. 905, 73 S.Ct. 644, 97 L.Ed. 1342 (1953). Two years later, in Livingston Shirt Corp., 107 N.L.R.B. 400 (1953), the Board appeared to modify its Bonwit Teller doctrine, and held that an employer does not commit an unfair labor practice in making a pre-election speech to employees on company property and denying a union request for an opportunity to reply. An exception to the Livingston Shirt rule was later announced, however, in May Department Stores Co., 136 N.L.R.B. 797 (1962), where the Board declared unlawful an employer "captive audience" speech made, without affording the union an opportunity to respond, in a department store context, where "broad but privileged" employee no-solicitation rules (prohibiting solicitation in working areas during nonworking time) had been enforced by the employer.
 
 
 55
 Relying on Babcock and NuTone, the Sixth Circuit denied enforcement of the Board order in May Department Stores. May Department Stores Co. v. NLRB, 316 F.2d 797 (6th Cir. 1963). The court held that the employer had not committed an unfair labor practice in delivering a captive audience speech, while enforcing a "broad but privileged" no-solicitation rule and denying the union equal time, since no showing had been made that employees could not be reached by the union through alternative means of communication. That critical standard from Babcock was again held to be determinative. 316 F.2d at 800-01.[22]
 
 
 56
 Despite the setbacks of NuTone and May Department Stores, unions did not abandon their fight to obtain greater access during organizational campaigns. Relying on language in NuTone suggesting that a "balance" should exist between the opportunities of unions and employers for organizational communication,[23] unions continued to press the Board for access to company property for solicitation purposes.
 
 
 57
 In Excelsior Underwear Inc., 156 N.L.R.B. 1236 (1966), the Board once again attempted to resolve this issue. The Board recognized in Excelsior that an employee can make an informed and reasoned choice in a representation election only if he has an effective opportunity to hear arguments concerning union representation from both labor and management. The Board also noted that an employer, through possession of employee names and addresses and the ability to communicate with employees on company premises, is virtually assured of a continuing opportunity to inform employees of management views.
 
 
 58
 Despite these facts, the Board in Excelsior was forced to recognize that union organizers have no right of access to company property except as narrowly established in Babcock. As a result, to reconcile the need for "full and fair communication" against the restraints imposed by Babcock, the Board set forth what has become known as the Excelsior rule. The Board held that within seven days after the Regional Director approves a consent-election agreement or directs the holding of an election, an employer must make available to the union a list of the names and addresses of all employees eligible to vote in the election.[24] In this way, unions are able to communicate with employees more easily off company property. In announcing the Excelsior doctrine, the Board decided to defer any reconsideration of union access rights until after the effects of Excelsior had become known. General Electric Co., 156 N.L.R.B. 1247, 1251 (1966).
 
 
 59
 Babcock has continued to be extended and reaffirmed in recent Supreme Court cases. In Central Hardware Co. v. NLRB, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972), the Supreme Court held that the Babcock analysis applies to questions of union access rights in an organizational campaign conducted in a large city, in which employees are scattered over a densely populated metropolitan area.[25] The Court in Central Hardware stated that Babcock set forth "the guiding principle" for adjusting conflicts between employee rights protected by Section 7 of the Act and private property rights. 407 U.S. at 544, 92 S.Ct. at 2241. In Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), the Supreme Court utilized this language and held that Babcock governs the rights of union members to engage in peaceful primary picketing within the confines of a privately owned shopping center.[26] See also Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 204, 98 S.Ct. 1745, 1761, 56 L.Ed.2d 209 (1978).[27]
 
 
 60
 The principles of Babcock were most recently reiterated by the Supreme Court in Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). The Court there stated:While Babcock indicates that an employer may not always bar nonemployee union organizers from his property, his right to do so remains the general rule. To gain access, the union has the burden of showing that no other reasonable means of communicating its organizational message to the employees exists or that the employer's access rules discriminate against union solicitation.
 
 436 U.S. at 205, 98 S.Ct. at 1761.[28]
 
 61
 In summary, Babcock and its progeny reflect well-established and strict rules governing union access rights to company property during an organizational campaign. Babcock and related cases make clear that an employer may deny a union access to company property, unless the union meets a heavy burden of showing that no other reasonable means of communicating its organizational message to the employees exist.
 
 III. UNION ACCESS AS A REMEDIAL MEASURE
 
 62
 In a separate series of cases, unions have been granted access to company property as a remedial measure for violations of the Act by an employer. We first consider general principles governing remedies under the National Labor Relations Act, and then turn to trace this development of union access as a remedial measure.
 
 
 63
 A. General Remedial Principles under the National Labor Relations Act
 
 
 64
 The authority of the Board to impose remedies for violations of the Act is granted by Section 10(c) of the Act, 29 U.S.C. § 160(c) (1976). That section provides in relevant part:
 
 
 65
 If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter.
 
 
 66
 The statute gives little guidance concerning the scope of this authority of the Board. Certain general principles, however, have been established by the courts.
 
 
 67
 First, is is firmly entrenched in the case law that the imposition of remedies is a matter of special administrative competence, subject to very limited judicial review. This principle is more than mere rhetoric or boilerplate; the administrative expertise of the Board in fashioning remedies, derived from its unique understanding of the complex relationship between labor and management in our industrial society and the policies incorporated in the labor laws, is not to be interfered with lightly by reviewing courts lacking that expertise.[29] As stated by the Supreme Court in Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943), the selection of remedies made by the Board must stand "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."
 
 
 68
 Despite this broad and important principle, the authority of the Board has certain recognized bounds. A second and equally fundamental principle governing Board remedies is that the powers of the Board are remedial, not punitive, and the Board may not justify an order solely on the ground that it will deter future violations of the Act. Bell & Howell Co. v. NLRB, 598 F.2d 136, 147 n.36 (D.C.Cir.), cert. denied, 442 U.S. 942, 99 S.Ct. 2885, 61 L.Ed.2d 312 (1979). As stated by the Supreme Court in Republic Steel Corp. v. NLRB, 311 U.S. 7, 11, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940), "(w)e do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe penalties or fines which the Board may think would effectuate the policies of the Act."[30]
 
 
 69
 These clean bounds of doctrine soon give way, however, to much hazier lines in application. While it is clear that Board remedies may not be punitive, the Supreme Court has also stated that Section 10(c) is a broad "command" that the Board order such affirmative action as is necessary to effectuate the purposes of the Act. NLRB v. J. H. Rutter-Rex Manufacturing Co., 396 U.S. 258, 262, 90 S.Ct. 417, 419, 24 L.Ed.2d 405 (1969). See International Union of Electrical Workers v. NLRB, 426 F.2d 1243, 1249 (D.C.Cir.), cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970). Indeed, the Supreme Court stated in NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953):
 
 
 70
 It is the business of the Board to give coordinated effect to the policies of the Act. We prefer to deal with these realities and to avoid entering into the bog of logomachy, as we are invited to, by debate about what is "remedial" and what is "punitive." It seems more profitable to stick closely to the direction of the Act by considering what order does, as (the order in this case) does, and what order does not, bear appropriate relation to the policies of the Act.
 
 
 71
 344 U.S. at 348, 73 S.Ct. at 289.
 
 
 72
 We believe that it is wise to pay heed to this warning of the Supreme Court not to get caught up in a semantic debate between what is "remedial" and what is "punitive." Certainly the Board has no power to "punish" offending parties, as distinguished from "remedying" unfair labor practices. Such labels oversimplify the problem, however. There is a danger that purely "compensatory" remedies may fail in some cases to effectuate fully the purposes of the Act. For instance, it has been recognized that an order granting reinstatement with back pay in an unlawful discharge case may amount to no more than "a license fee for union busting." Staff of Subcommittee on NLRB, House Committee on Education and Labor, 87th Cong., 1st Sess., Administration of the Labor-Management Relations Act by the NLRB 2 (Comm. Print 1961).[31] An unlawful discharge may affect employees who are not themselves the subject of employer action; an atmosphere of fear and anxiety may be created that is very difficult to define or quantify and remedy. If the Act is to be effectuated fully, these effects are perhaps the most important to offset.
 
 
 73
 This problem is most acute in cases of parties who have demonstrated an unyielding disregard for the Act by repeatedly committing unfair labor practices and ignoring Board orders to cease and desist from unlawful conduct. It long has been evident to the Board and the courts that some "stronger medicine" is necessary to effectuate the policies of the Act in cases of recidivist violators. As a result, it is now firmly established that the Board has the power and indeed the obligation to take into account a history of recalcitrance in designing a remedial order. Textile Workers Union v. NLRB, 475 F.2d 973, 976 (D.C.Cir. 1973).[32] As stated in Containair Systems Corp. v. NLRB, 521 F.2d 1166 (2d Cir. 1975):Without doubt the Board has a duty in a litigated case to employ broader and more stringent remedies against a recidivist than those usually invoked against a first offender, particularly where normal remedies have proved to be ineffective after earlier proceedings. Otherwise the Board might fail to carry out the mandates of § 10(c) of the Act, 29 U.S.C. § 160(c), which obligates it to order a proven violator "to take such affirmative action as will effectuate the policies of this act."
 
 521 F.2d at 1171.[33]
 
 74
 It could be said that this attitude toward recidivists is irreconcilable with the notion that Board orders may not be punitive or designed to deter. If Section 10(c) commands the Board in every case to impose such affirmative remedial action as is necessary to effectuate the policies of the Act, it is difficult to conceptualize what "more" can be imposed against a recidivist that is not in some way punitive. Courts thus far have rarely addressed this potential inconsistency.
 
 
 75
 In resolving this conflict, we are tempted simply to note again the statement of the Supreme Court in NLRB v. Seven-Up Bottling Co., supra, that rather than focus on what is remedial and what is punitive, "(i)t seems more profitable to stick closely to the direction of the Act by considering what order does, and what order does not, bear appropriate relation to the policies of the Act." 344 U.S. at 348, 73 S.Ct. at 289. We believe that it is possible, however, to reconcile the need to impose more stringent remedies against recidivists with the incantation that Board orders not be punitive.
 
 
 76
 This reconciliation is based upon the fact, perhaps simply unspoken in earlier cases, that in the case of a recidivist violator "the whole may be greater than the sum of its parts." In other words, a series of violations may have a cumulative effect on employees that is greater than the combined effect of each violation viewed in isolation. Employees may be affected deeply by the mere fact that an employer has demonstrated a staunch willingness to violate the Act in open defiance of past Board orders. More "stringent" remedies are required to offset this additional effect that is not present in the case of a first-time offender. These remedies may appear "punitive" in the context of an individual case, but are clearly "remedial," and therefore proper, in the context of the total conduct of a recidivist violator.[34]
 
 
 77
 B. "Union Access" as a Remedial Measure at a Plant Where Unfair Labor Practices Occurred
 
 
 78
 Grants of union access to company property have been ordered by the Board to remedy violations of the Act by an employer. Generally, such access has been limited to the site at which unfair labor practices were committed. While the use of access as a remedial measure appears to be increasing, the development of this remedial tool has not been marked by any consistent standard or theory.
 
 1. Union Access to Bulletin Boards
 
 79
 The most common form of access granted to a union as a remedial measure is a grant of access to bulletin boards of the plant. Access to bulletin boards is perhaps the least intrusive form of access to company property, yet provides the union an important means by which to communicate with employees. That communication is often essential to offset effects caused by the unlawful conduct of an employer.
 
 
 80
 Access to bulletin boards as a remedial measure has been imposed in a variety of cases. Most often, access to bulletin boards is ordered to remedy "flagrant violations," "outrageous conduct," or "a gross interference with employees' organizational rights."[35] Access to bulletin boards has also been granted in cases in which the employer had an extended history of unlawful conduct.[36]
 
 
 81
 In certain cases, the remedial nature of a grant of access to bulletin boards has been made clear. In John Singer, Inc., 197 N.L.R.B. 88, 90 (1972), the Board found that union access to bulletin boards was necessary because additional forms of communication were needed to allow the union to reclaim allegiance lost as a result of the company's frivolous refusal to bargain. See also Koval Press, Inc., 241 N.L.R.B. No. 189, at 10 (May 4, 1979), enforced, NLRB v. Koval Press, Inc., 622 F.2d 579 (3d Cir. 1980). In J. P. Stevens & Co. v. NLRB (Stevens II), 388 F.2d 896 (2d Cir. 1967), cert. denied, 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968), the court upheld a grant of union access to bulletin boards in order to offset the company's use of bulletin boards in a coercive campaign against the union. The court in Stevens II noted that access to bulletin boards also was "appropriately designed to dissipate the fear in the atmosphere within the Company's plants generated by its anti-union campaign." 388 F.2d at 906.
 
 
 82
 This use of bulletin board access as a remedial measure designed to dissipate an atmosphere of fear was further explained by the Fifth Circuit in J. P. Stevens & Co. v. NLRB (Stevens V), 417 F.2d 533 (5th Cir. 1969). The court in Stevens V noted that while reinstatement and back pay may remedy the direct consequences of an unlawful discharge, there is a substantial danger that these traditional remedies will do nothing to dissipate the fear and anxiety that may be caused by widespread unlawful conduct. The court thus upheld a grant of union access to bulletin boards, stating:
 
 
 83
 Surely, the Board could conclude that this rather impersonal outlet for Union views was necessary to eliminate the employees' apprehension of incurring the risk of discharge or other retaliation if they engaged in personal solicitation either in or out of the plant.
 
 
 84
 417 F.2d at 540. The court upheld the grant of access while admitting that "(w)e do this even though there was no specific showing that the Union was unable to disseminate its lawful propaganda." Id.
 
 
 85
 In other cases, however, courts and the Board have taken a different approach. Placing greater emphasis on the principles announced in NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), access to bulletin boards has been rejected as a remedial measure where alternative means existed for the union to bring its message to the employees. See Greenfield Manufacturing Co., 199 N.L.R.B. 756, 757 n.7 (1972). In the first J. P. Stevens case, J. P. Stevens & Co. v. NLRB, 380 F.2d 292 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967), the court refused to enforce a provision granting the union access to plant bulletin boards. Although the court upheld a finding of the Board that 71 employees had been discharged unlawfully for engaging in union activity, the court ruled that access to bulletin boards was not warranted, on the grounds that "(n)o unique problem of access has been shown," and that "the Board made virtually no findings concerning the issues relevant to solicitation, and made no adequate showing that the Company's bulletin boards are necessary to the Union in its organizational campaign." 380 F.2d at 305.
 
 2. Direct Plant Access for Union Organizers
 
 86
 A similarly inconsistent development has occurred in the use of direct plant access for union organizers as a remedial measure. It is clear that the use of this remedy by the Board is increasing, once again typically limited to the site of the unfair labor practice. As with access to bulletin boards, the general theory behind the use of this remedial tool is that greater communication between the union and employees is needed to dissipate the effects of fear and oppression that have been created by serious or repeated employer unfair labor practices. The effect of Babcock in this setting, however, has been felt more clearly.
 
 
 87
 In a series of cases, direct union access to company property as a remedial measure has been denied because alternative means existed by which the union could communicate with employees. Citing Babcock, the Board in Greenfield Manufacturing Co., 199 N.L.R.B. 756 (1972), denied a union request for access to property as a remedial measure, stating:
 
 
 88
 In our view, the record does not justify the application of this species of extraordinary relief because viable alternative means for the Union's organizational access to employees appear to be at hand.
 
 
 89
 199 N.L.R.B. at 757 n.7. Similarly, in Heck's Inc., 191 N.L.R.B. 886 (1971), enforced in relevant part, Food Store Employees Local 347 v. NLRB, 476 F.2d 546 (D.C.Cir. 1973), reversed in part on other grounds, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974), the Board rejected a request for direct access as a remedial measure, stating that such a remedy is not warranted "unless, as is not established to be the case here, alternative means of access are clearly unavailable or have been tried and found wanting." 191 N.L.R.B. at 887 (citing Babcock).[37]
 
 
 90
 Similarly, in Winn-Dixie Stores, Inc., 224 N.L.R.B. 1418 (1976), enforced in relevant part, Winn-Dixie Stores, Inc. v. NLRB, 567 F.2d 1343 (5th Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978), the Board adopted a statement of an Administrative Law Judge concerning the relationship of Babcock to direct union access as a remedial measure. In denying a request that access be incorporated in a remedial order, the ALJ stated:
 
 
 91
 I would find that an imbalance has been created by Respondent's unfair labor practices, which would tend to critically impair the Union's opportunities for effective communication among all but the most militant employee supporters of the Union at the Jacksonville warehouse. Yet as illogical as the law may appear in this regard, under the precedent no weight is accorded to a lack of access attributed to unfair labor practices; instead, only imbalances attributable to physical factors are regarded as relevant to the inquiry.
 
 
 92
 224 N.L.R.B. at 1459 n.17.
 
 
 93
 An opposite approach was taken by the court in Decaturville Sportswear Co. v. NLRB, 406 F.2d 886 (6th Cir. 1969). In that case, the Sixth Circuit enforced a remedial provision that granted union organizers access to plant approaches and parking lots during nonworking time for a period of six months. The court completely rejected the applicability of Babcock in the remedial setting. As stated by the court:
 
 
 94
 National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), on which the company relies, is not inconsistent with our decision on this point. There, the question was whether denial of access to company property in order to distribute union literature constituted an unfair labor practice and the Supreme Court held it did not. Here, the question is whether reasonable access to company property for a limited time is an appropriate remedial measure after a finding of unfair labor practices. The two questions involve different considerations. We conclude therefore that this is a valid exercise of the Board's authority.
 
 
 95
 406 F.2d at 889. See also Teamsters Local 115 v. NLRB, 641 F.2d 984 at 992 (D.C.Cir. 1981).
 
 
 96
 Finally, a number of cases have approached the question of plant access as a remedial measure without any discussion of Babcock at all. In International Union of Electrical Workers v. NLRB, 383 F.2d 230, 232 n.4 (D.C.Cir. 1967), cert. denied, 390 U.S. 904, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968); this court enforced, due to "aggravated circumstances" present in the case, that portion of a Board order granting the union access for one hour, on company time and at company expense, to give a presentation of the union position.[38] In a recent series of cases, due to the presence of unfair labor practices so "outrageous" and "pervasive" that "conventional remedies will not suffice to dissipate them and are inadequate to give Respondent's employees sufficiently explicit reassurances and understanding of their rights under the Act," the Board has granted unions (1) access to nonwork areas of the plant during nonworking time, (2) access to respond to any anti-union speech by the employer, and (3) access to the plant to make a 30-minute speech prior to any election in which the union is a participant. United Dairy Farmers Cooperative Association, 242 N.L.R.B. No. 179, at 10, 12 (June 12, 1979); Haddon House Food Products, Inc., 242 N.L.R.B. No. 180 (June 12, 1979), enforced in relevant part, Teamsters Local 115 v. NLRB, 641 F.2d 984 (D.C.Cir. 1981); Sambo's Restaurant, Inc., 247 N.L.R.B. No. 122, at 4 (Feb. 4, 1980); F.W.I.L. Lundy Brothers Restaurant, Inc., 248 N.L.R.B. 415, 436 (1980).
 
 
 97
 In other cases, access has been denied without reference to Babcock. In C.W.F. Corp., 188 N.L.R.B. 554, 560 (1971), enforced, Retail Store Employees Local 400 v. NLRB, 458 F.2d 792 (D.C.Cir. 1972), access was denied simply because lesser remedies were deemed adequate.[39] In Malrite of Wisconsin, Inc., 213 N.L.R.B. 830 (1974), the Board denied a request for access as a remedial measure on entirely different grounds. The Board stated that to grant access in that case "would put the Board in the position of appearing to lend support to the unionization of Respondent's engineers by one particular union regardless of whatever interest another union might have. In such matters the Board must be and appear to be scrupulously neutral." 213 N.L.R.B. at 831. Similar concerns were expressed by a dissenting member in another Board case granting broad union access as a remedial measure. United Dairy Farmers Cooperative Association, 242 N.L.R.B. No. 179, at 12 n.15 (June 12, 1979). See also Haddon House Food Products, Inc., 242 N.L.R.B. No. 180, at n.11 (June 12, 1979), enforced in relevant part, Teamsters Local 115 v. NLRB, 641 F.2d 985 (D.C.Cir. 1981).
 
 
 98
 C. Union Access as a Remedial Measure Beyond the Plant Where the Unfair Labor Practice Occurred
 
 
 99
 As set forth above, an extensive campaign of unfair labor practices can produce effects on employees in a plant that cannot be offset by reinstating discharged employees or setting aside a challenged election. Widespread unlawful practices may create an atmosphere of fear chilling the exercise of employee rights guaranteed by the Act. While such effects are often produced by a prolonged campaign in which an employer demonstrates a deliberate disregard of protected legal rights by repeatedly violating the Act and ignoring Board orders, an atmosphere of tension and apprehension may be created even without an extensive history of past violations. As Judge Mikva aptly recognized in Teamsters Local 115 v. NLRB, at 992 (D.C.Cir. 1981), "an employer who strikes the first blow hard enough may not need to strike another."
 
 
 100
 To offset the effects caused by such unfair labor practices, courts and the Board have recognized that more extensive remedies are at times needed. Employees must be assured that certain rights do exist and will be protected. In order to bring that critical message home to employees, it has been found necessary in some cases to grant the union access to company bulletin boards or even to the plant itself. Without utilizing these additional means of communication, there may be no way to dissipate lingering effects caused by an unlawful anti-union campaign and to allow employees to make a free, uncoerced choice concerning union representation.
 
 
 101
 In some cases, however, even this increased access at the site where unfair labor practices have been committed may not be enough to remedy the effects of a strong, unlawful employer campaign. As recognized by the Supreme Court in Textile Workers Union v. Darlington Manufacturing Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), employer practices at one plant may have a "chilling effect" on the employees at another plant. In Darlington, a company closed one of its 18 plants following a successful union campaign at that plant, an action the Board found to be an unfair labor practice.[40] In reviewing this finding, the Supreme Court noted that an employer has an absolute right to terminate its entire business at any time for any reason. The Court recognized, however, that a partial closing of only one plant could produce effects elsewhere in the company, and held that such action may violate the Act "if motivated by a purpose to chill unionism in any of the remaining plants." 380 U.S. at 275, 85 S.Ct. at 1002. Thus, an otherwise lawful act was held to become unlawful if accompanied by an intent to chill the exercise of protected employee rights at other company locations.
 
 
 102
 In the present context, the employer actions are themselves unlawful. The critical point recognized in Darlington, however, is that employer actions at one plant may produce a chilling effect on employees elsewhere in the company. It is inevitable that such chilling effects can and do occur. Employees do not live in a vacuum. Actions of their employer at another company location may reach them directly through intra-company communications, or through the outside media. Necessary business transactions may bring employees in one plant in contact with those in another. As this case illustrates, the company itself may publicize an unlawful response to unionism at one plant as a warning to employees at other company locations. In short, a well-coordinated unlawful campaign at one plant may produce chilling effects throughout a corporate structure.
 
 
 103
 To offset companywide effects caused by extensive unlawful conduct, courts and the Board have expanded remedial measures beyond the actual locations at which unfair labor practices were found.[41] In certain cases, remedies designed to facilitate union communication and dissipate harmful effects have been applied companywide. In rare instances, such remedies have included corporatewide grants of union access to company property.
 
 
 104
 The most extensive corporatewide access remedies have been imposed in cases involving J. P. Stevens Company. It will serve no good purpose here to describe J. P. Stevens' prolonged and unlawful campaign against the United Textile Workers and the relentless efforts of the Board to dissipate the effects caused by that campaign. From the very first Stevens case, the Board found that the company's practices were so extensive and so well-publicized as to have a coercive impact at plants other than those at which unfair labor practices were found. See J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 304 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967).
 
 
 105
 Two recent Stevens cases are of special relevance here. In both J. P. Stevens & Co. v. NLRB, 612 F.2d 881 (4th Cir.), cert. denied, -- U.S. --, 101 S.Ct. 315, 66 L.Ed.2d 145 (1980), and J. P. Stevens & Co. v. NLRB, 623 F.2d 322 (4th Cir. 1980), cert. denied, -- U.S. --, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981), Board orders were enforced that granted the union broad access to all of the company's plants.[42] The union was given the right, on a corporatewide basis, to respond to any employer speech concerning union representation, to address the employees before any election scheduled by the Board, and, most importantly, to have access to all nonwork areas of the plants to communicate with employees.
 
 
 106
 The company objected to the broad access provisions in each case. In the first case, reported at 612 F.2d 881, the company objected to the extraordinary corporatewide relief on the ground that the unfair labor practice found occurred only at its Tifton, Georgia plant. The Board had found that the corporatewide access remedy was needed "(i)n view of Respondent's history of serious and similar violations of the Act, and its disregard of past Board Orders." 240 N.L.R.B. 33 at 33 (1979). The court enforced the Board's remedial order with little discussion. 612 F.2d at 882.
 
 
 107
 In the second case, reported at 623 F.2d 322, the company presented a more specific objection. Since the unfair labor practice found in that case was a refusal to bargain at an organized plant, the company argued that the imposition of remedies that would affect the union's organizational efforts at other unorganized plants was punitive and improper. The Fourth Circuit disagreed. As stated by the court:
 
 
 108
 This provision of the Board's order is predicated on its finding that the company employed its unlawful bargaining strategy to chill the union's organization of other plants. The notice and access order is designed to counteract the use the company has made at other plants of its unfair labor practices in bargaining at Roanoke Rapids.
 
 
 109
 623 F.2d at 327. The broad access provisions were again upheld.
 
 
 110
 In addition to these two Stevens cases, we again note the recent decision of the Fifth Circuit in another Florida Steel case. Florida Steel Corp. v. NLRB, 620 F.2d 79 (5th Cir. 1980). In that case, as here, the Board ordered that the union be provided access to all plants of Florida Steel. As described at the outset, the Fifth Circuit enforced those provisions of the order granting union access to the two organized Florida Steel plants. However, the court did not enforce the grant of access to other unorganized plants; the court instead adopted the position urged by J. P. Stevens in the latter case described above. As stated by the court, "(i)n requiring this access to be provided at plants where the Steelworkers union is not a bargaining representative, however, the Board's order cannot be viewed as remedial with respect to the charge before it, one involving interference with the union's performance of its role as a bargaining representative." 620 F.2d at 83.
 
 
 111
 In none of these corporatewide access cases have the courts discussed the possible relevance of the principles of NLRB v. Babcock & Wilcox Co. As demonstrated above, the effect of Babcock on the use of access as a remedial measure has varied tremendously. Even in cases ignoring Babcock, courts have differed with respect to the extent to which access may be used as a remedial measure. Having explored this background in some detail, we turn now to attempt to set forth some guiding principles concerning the proper use of union access to company property as a remedial tool.
 
 
 112
 IV. THE APPROPRIATE STANDARDS TO BE APPLIED IN CASES
 
 INVOLVING "UNION ACCESS" AS A REMEDIAL MEASURE
 
 113
 Remedial orders granting a union access to company plants necessarily affect private property rights, and often have an impact on organizational campaigns. Since the Supreme Court in NLRB v. Babcock & Wilcox Co. set forth principles governing conflicts between private property rights and organizational access rights, that case often has had an effect on the propriety of union access as a remedial measure.
 
 
 114
 As stated above, the impact of Babcock has varied tremendously. At one extreme, an Administrative Law Judge has suggested that "no weight is accorded to a lack of access attributed to unfair labor practices; instead, only imbalances attributable to physical factors are regarded as relevant to the inquiry." Winn-Dixie Stores, Inc., 224 N.L.R.B. 1418, 1459 n.17 (1976). Other decisions have applied Babcock literally to remedial situations and have granted access only when the union can show, perhaps as a result of the unfair labor practices involved, that no alternative means of communication exist. Yet another group of cases has considered the appropriateness of access as a remedial measure without any discussion of the relevance or impact of Babcock principles.
 
 
 115
 As more fully developed below, we believe that the principles announced in Babcock do not govern the propriety of union access granted as a remedial measure. We agree with the position taken by the Sixth Circuit in Decaturville Sportswear Co. v. NLRB, 406 F.2d 886 (6th Cir. 1969), that the propriety of access as an organizational tool and the propriety of access as a remedial measure are two separate questions, and that "(t)he two questions involve different considerations." 406 F.2d at 889. This approach has been endorsed very recently in this Circuit. In Teamsters Local 115 v. NLRB, 641 F.2d 984 (D.C.Cir. 1981), this court considered a broad grant of union access ordered by the Board as a remedial measure, and stated:
 
 
 116
 The Employer next cites N.L.R.B. v. Babcock & Wilcox Co., 351 U.S. 105 (76 S.Ct. 679, 100 L.Ed. 975) (1956), and its progeny, as authority for the proposition that the Employer's property rights preclude union access to the property unless there are no other reasonable means of reaching the employees. But none of these cases deal with the remedial powers of the Board; they only seek to determine when an employer's denial of access to his property can itself be deemed an unfair labor practice, see Decaturville Sportswear Co. v. N.L.R.B., 406 F.2d 886, 889 (6th Cir. 1969).
 
 
 117
 Id., at 993 (emphasis in original; footnote omitted). The court in Teamsters enforced an order of the Board granting the union access to bulletin boards, reasonable access to nonwork areas of the plant during nonwork time, equal time to respond to employer speeches, and the right to address employees on working time prior to any election in which the union was a participant.[43]
 
 
 118
 We agree that there is a critical difference between access as an organizational tool and access as a remedial measure. Absent unfair labor practices, private property rights entitle an employer to restrict the ability of union organizers to enter company property and solicit for the union. As long as important employee rights may be exercised through other means, equally important private property rights need not be sacrificed. When an employer directly interferes with those employee rights, however, different considerations come into play. The Act contains a broad command that the Board take such affirmative action as is necessary to safeguard employee rights and thus effectuate the policies of the Act. As illustrated above, certain employer conduct may be of such a nature that some form of union access is needed to dissipate an atmosphere of fear and helplessness that has been created and to assure employees that fundamental rights exist and will be protected. In such a case, an employer cannot avoid the direct consequences of its own actions by invoking the talisman of private property rights. As employee rights have been violated, so too may private property rights be compromised. Private property rights are easily safeguarded, as decreed by Babcock and its progeny, by simple adherence to the strictures of the Act.
 
 
 119
 We hold, therefore, that access may be imposed as a remedial measure without a finding that the union will be unable to reach the employees through other available channels of communication. Instead, the critical inquiry is whether the employer conduct is of such a nature that access is needed to offset harmful effects that have been produced by that conduct. If union access is needed to dissipate those effects, access may be granted even though the union has alternative means of communicating with employees.
 
 
 120
 We also acknowledge, as developed above, that certain employer conduct may produce effects beyond the plant in which the unfair labor practices were committed. This is particularly true in cases in which an employer publicizes its unlawful conduct in an attempt to warn employees at other plants. In such situations, if access is needed to dissipate effects produced beyond the site where the unfair labor practices were committed, access may be awarded as a remedial measure beyond that location. If an extensive anti-union campaign has produced coercive effects corporatewide, access as a remedial measure may be imposed corporatewide as well.
 
 
 121
 Furthermore, we hold that access as a remedial measure at unorganized plants may be predicated on a finding by the Board that a company's unlawful bargaining strategy at an organized plant has chilled employee rights at the unorganized plants. In Florida Steel Corp. v. NLRB, 620 F.2d 79 (5th Cir. 1980), the Fifth Circuit held that access in such a case could not be, by definition, "remedial." We disagree. As stated above, the critical inquiry in these cases is whether the unlawful conduct of the employer has produced coercive effects chilling the free exercise of employee rights. Those effects can be produced as easily by a repeated refusal to bargain with a certified union as by improper interrogation or unlawful discharges during an organizational campaign. As was found by the Fourth Circuit in J. P. Stevens & Co. v. NLRB, 623 F.2d 322 (4th Cir. 1980), cert. denied, -- U.S. --, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981), "the Board's order is predicated on its finding that the company employed its unlawful bargaining strategy to chill the union's organization of other plants." 623 F.2d at 327. We agree that access at unorganized plants may be necessary in an appropriate case to remedy a refusal to bargain at an organized plant, and that such access therefore would not be improper.
 
 
 122
 The hallmark principle in each of these applications of access as a remedial measure is the necessity to offset coercive effects caused by an employer's unlawful campaign. As those effects spread and become entrenched, so too may an access remedy. In this way, grants of access are designed fully to effectuate the policies of the Act; access is ordered to remedy the effects of unlawful behavior and not to punish or deter an employer. It is clear that the principles of Babcock have no direct application in this setting.
 
 
 123
 At the same time, we recognize that the presence of Babcock cannot be totally ignored. Access may be awarded as a remedial measure if necessary to offset the direct consequences or effects of an employer's unlawful conduct. Having produced such effects, an employer cannot hide behind the protection of Babcock or private property rights. If those effects are not present, however, the above analysis fails. Absent the necessity to counter these harmful consequences, access cannot be justified as a remedial measure and instead may directly affront the principles announced in Babcock. As a result, before access may be imposed, it is critical that a clear showing be made that access is needed to reassure employees of the existence and vitality of protected legal rights.
 
 
 124
 In granting access as a remedial measure, therefore, a burden lies upon the Board to substantiate its conclusion that access is necessary to offset the consequences of unlawful employer conduct. In articulating the standard that the Board must meet, we are sensitive to the difficulty the Board faces in establishing that the exercise of employee rights has been chilled. Coercive effects are difficult to prove, yet at the same time the most important to dissipate. Certainly in this setting even more so than in other areas, the Board possesses an unmatched expertise in distilling and identifying the effects of unlawful employer conduct. We believe that the Board may rely on that expertise, and on the cumulative experience of past cases, to presume that certain employer conduct will inevitably produce certain effects on employees.
 
 
 125
 Given the amount at stake in this setting, however, a conclusory statement by the Board that access is needed to neutralize effects is not sufficient to justify a grant of access. Assumptions must be supported by evidence in the record. The seriousness of the violations at issue must be weighed. Where access is awarded beyond the locations at which unfair labor practices are found, the extent to which employees located in other plants know, or have reason to know, of unlawful conduct must be considered. The distance between the employer's operations may be relevant. The presence or absence of union activity at various company locations is an important factor that should be considered.[44] In the case of a recidivist violator, the effect of the passage of time between violations must be evaluated.[45] In short, we hold that the Board must find that it is reasonably foreseeable that the employees at those plants where access is imposed have suffered coercive effects from the employer's unlawful conduct and that an access remedy is necessary to cure those effects.
 
 
 126
 In summary, the Board has a broad authority to use access as a remedial measure if such a remedy is necessary to offset coercive effects caused by unlawful employer action. We endorse that principle as rigorously as we require the Board to demonstrate that such access is necessary and therefore remedial. We do not impose here an impossible burden on the Board; we simply believe that given the existence of constraints bordering the use of access as a remedial measure, the Board must not be conclusory in the use of this remedial tool. In requiring the Board to substantiate its action in this area, the authority of the Board to use access as a remedial measure will not be weakened.
 
 V. THE DISPOSITION OF THIS PROCEEDING
 
 127
 The Board order in this case granted the union broad rights of access at every plant of Florida Steel. Access was ordered at the plant at which the unfair labor practice was found, at an additional organized plant of Florida Steel, at two plants where organizational activity had been conducted, and at all other company locations where no organizational drives had yet begun. In addition to this broad access remedy, the Board ordered that various forms of corporatewide notice be issued by the company. The Board denied, however, union requests for access to bulletin boards and for a list of the names and addresses of all Florida Steel employees.
 
 
 128
 We believe that each of the remedies imposed in this proceeding is within the authority of the Board to impose in an appropriate case. As developed above, each of these remedies may be ordered if necessary to offset the effects of unlawful employer conduct. Furthermore, the Board was clearly entitled, in shaping its remedial order in this case, to consider the extensive record of past unlawful activity of Florida Steel.
 
 
 129
 We are unable, however, to enforce the order of the Board. The Board has failed to make the findings described above that these corporatewide remedies are necessary to offset coercive or chilling effects caused by the employer conduct at issue, even as that conduct is magnified by the existence of previous violations of the Act. The Board has not yet demonstrated that it is reasonably foreseeable that such effects have been produced on a corporatewide basis.
 
 
 130
 The Administrative Law Judge in this action found that the violation at issue here could be remedied adequately through the use of traditional cease and desist and affirmative remedial orders. The Board disagreed, and concluded that "extra remedial relief is necessitated by Respondent's proclivity to disregard the statutory rights of its employees and their chosen bargaining representatives." 244 N.L.R.B. No. 61 at 2 (Aug. 20, 1979). The Board supported this conclusion by reference to "reasons fully explicated" in an earlier Florida Steel case, 242 N.L.R.B. No. 195 (June 20, 1979). The Board also noted that the present action was not the initial transgression of employee rights at the Florida Steel plant involved; the Board cited an earlier case in which the Board had found that Florida Steel violated the Act at the Indiantown plant by withholding a wage increase in retaliation for union activities of the employees. The Board made no findings in this case concerning effects caused by the unlawful employer conduct, either at the immediate plant involved or at any other facility of Florida Steel.
 
 
 131
 In the earlier decision relied upon by the Board, 242 N.L.R.B. No. 195, the Board reviewed at length "the repetitive and flagrant nature" of violations of the Act by Florida Steel. 242 N.L.R.B. No. 195 at 2. The Board stated in that case that extraordinary remedies were needed "to fully remedy Respondent's rejection of the principles of collective bargaining as evidenced by its pattern of unlawful conduct in recent years." Id. The Board also found that "(t)he instant violation is yet another step in what can only be characterized as a corporate campaign to chill employee organizational activity throughout its facilities through unlawful conduct." Id. at 4. The only statement made by the Board concerning the effects produced by this unlawful campaign, however, was a conclusory assertion in a footnote that extraordinary remedies were "essential to neutralize the effects of Respondent's continuing pattern of unlawful conduct in recent years." Id. at 5 n.10.
 
 
 132
 These statements are insufficient to substantiate the conclusion that corporatewide access is needed to offset coercive or chilling effects produced corporatewide by the unlawful conduct of Florida Steel. We are no less disturbed than the Board by the extensive history of unlawful conduct of this employer. However, that history alone cannot justify the relief ordered in this case. We have already noted the factors that the Board must weigh before granting union access as a remedial measure. We repeat, for emphasis, that with respect to locations other than the plant where the unfair labor practice has occurred, the Board must find that it is reasonably foreseeable that the employees at these other locations have suffered coercive effects from the employer's unlawful conduct and that an access remedy is necessary to cure those effects. Absent these findings, the Board order at issue here cannot be justified as remedial action, and can only be explained as containing punitive measures designed to deter future violations of the Act.
 
 
 133
 There is evidence in two earlier Florida Steel proceedings that the company used statutory violations committed at one plant as a "warning" to employees at another plant.[46] On our examination of the record, however, no such evidence has been uncovered since 1977. Moreover, there appears to be no evidence that the company has ever publicized its unlawful conduct corporatewide, or indeed at any of the plants at which there has not yet been union activity. We simply cannot assume from the evidence in this record that the conduct of Florida Steel has had a corporatewide chilling effect upon employees. Given the critical need for coercive effects to be present before access is awarded at the unorganized plants of Florida Steel, we are unable at this time to enforce the order of the Board.
 
 
 134
 We recognize that chilling effects are sometimes difficult to prove. Moreover it has not been clear previously what the Board must find to justify a broad grant of access imposed as a remedial measure. We have decided, therefore, to remand this case to the Board for further consideration. This decision is consistent with previous cases in this Circuit that have remanded cases to the Board for a more complete explanation of a remedial order. See Textile Workers Union v. NLRB, 475 F.2d 973, 976 (D.C.Cir. 1973); UAW v. NLRB, 455 F.2d 1357, 1369-70 (D.C.Cir. 1971).
 
 
 135
 It is possible that as a result of the guidelines set forth in this opinion, the Board may decide on remand that some remedies included in this order are not appropriate. Such a decision may lead the Board to impose other remedies, not here ordered, to offset the effects of the unlawful employer conduct. As a result, we do not here address the propriety or impropriety of each remedial measure granted or requested in this case. An entire restructuring of the remedial order may be necessary; we express no opinion on the course such restructuring, if at all necessary, should take. We emphasize again that all of the remedies included in this order fall within the scope of authority of the Board; certain remedies may be imposed, however, only in an appropriate case after necessary findings are made.
 
 
 136
 There is one additional aspect of the order at issue in this case that we call attention to the Board to consider more fully on remand. Certain provisions of the Board order grant advantages to the Steelworkers Union that competing unions, if any exist, do not similarly receive. We have some reservations concerning the propriety of such an order, particularly at plants in which the Steelworkers have not yet engaged in organizational activity. We reserve judgment on this issue, however, pending further consideration and explanation by the Board on remand.
 
 
 137
 We recognize that this is a difficult case. Although we have expressed some concerns about certain aspects of the Board's order, we do not in any way suggest that the Board should act less aggressively in enforcing the Act. We simply require that the Board act more deliberatively. We therefore remand this case for further proceedings consistent with this opinion.
 
 
 138
 So ordered.
 
 
 
 [1]
 Eight other employees were named in the complaint. For various reasons not contested here, the complaint was dismissed as to those employees. See Florida Steel Corp., 235 N.L.R.B. 1010 (1978), supplemented, 244 N.L.R.B. No. 61 (Aug. 20, 1979)
 
 
 [2]
 The original decision of the ALJ is appended to 235 N.L.R.B. 1010 (1978)
 
 
 [3]
 235 N.L.R.B. at 1014
 
 
 [4]
 Florida Steel Corp., 235 N.L.R.B. 1010 (1978)
 
 
 [5]
 235 N.L.R.B. at 1011. Although the union was not certified by the Board as bargaining representative until June 1975, the Board held that Florida Steel had "a precertification obligation to bargain with the Union over its decision to effect a post layoff change in McCammon's and McDonald's pay for performing the same work." Id. at 1010
 
 
 [6]
 The supplemental decision of the ALJ is appended to 244 N.L.R.B. No. 61 (Aug. 20, 1979)
 
 
 [7]
 Florida Steel Corp., 244 N.L.R.B. No. 61 (Aug. 20, 1979)
 
 
 [8]
 There has been organizational activity at the Charlotte plant in Croft, North Carolina, and at plants in Tampa, Jacksonville, and Indiantown, Florida
 
 
 [9]
 In 10 of the 12 cases that have been reviewed by an appellate court, the court has granted enforcement of the Board orders in full or with minor modification. In two cases enforcement has been denied. See Florida Steel Corporation : 214 N.L.R.B. 264 (1974) (Croft), supplemented, 221 N.L.R.B. 1008 (1975), enforced in part, 551 F.2d 306, 94 L.R.R.M. 2589 (4th Cir. 1977); 215 N.L.R.B. 97 (1974) (Tampa), enforced in part, 529 F.2d 1225 (5th Cir. 1976), supplemented, 234 N.L.R.B. 1089, enforced, 586 F.2d 840 (5th Cir. 1978) (table); 220 N.L.R.B. 225 (1975) (Tampa), enforced in part, 544 F.2d 896 (5th Cir. 1977); 220 N.L.R.B. 260 (1975) (Croft), enforced, 543 F.2d 1389 (D.C.Cir.1976) (table); 220 N.L.R.B. 1201 (1975) (Indiantown), enforced, 538 F.2d 324 (4th Cir. 1976) (table); 221 N.L.R.B. 371 (1975) (Tampa), enforced, 534 F.2d 1405 (5th Cir. 1976) (table); 221 N.L.R.B. 554 (1975) (Croft), supplemented, 226 N.L.R.B. 123 (1976), enforced, 562 F.2d 46 (4th Cir. 1977) (table); 222 N.L.R.B. 955 (Jacksonville), enforced, 536 F.2d 1385 (5th Cir. 1976) (table); 223 N.L.R.B. 174 (1976) (Jacksonville); 224 N.L.R.B. 45 (1976) (Tampa); 224 N.L.R.B. 587 (1976) (Tampa), enforced, 552 F.2d 368 (5th Cir. 1977) (table); 231 N.L.R.B. 651 (1977) (Tampa), enforcement denied, 586 F.2d 436 (5th Cir. 1978); 231 N.L.R.B. 923 (1977) (Croft); 233 N.L.R.B. 491 (1977) (Tampa), enforcement denied, 587 F.2d 735 (5th Cir. 1979); 235 N.L.R.B. 941 (1978) (Croft), enforced in part, 601 F.2d 125 (4th Cir. 1979); 235 N.L.R.B. 1010 (1978) (Indiantown), supplemented, 244 N.L.R.B. No. 61 (Aug. 20, 1979) (present case on appeal); 242 N.L.R.B. No. 195 (June 20, 1979) (Croft), enforced in part, 620 F.2d 79 (5th Cir. 1980)
 
 
 [10]
 Florida Steel Corporation : 220 N.L.R.B. 260 (1975) (Croft), enforced, 543 F.2d 1389 (D.C.Cir.1976) (table); 220 N.L.R.B. 1201 (1975) (Indiantown), enforced, 538 F.2d 324 (4th Cir. 1976) (table); 221 N.L.R.B. 371 (1975) (Tampa), enforced, 534 F.2d 1405 (5th Cir. 1976) (table); 221 N.L.R.B. 554 (1975) (Croft), supplemented, 226 N.L.R.B. 123 (1976), enforced, 562 F.2d 46 (4th Cir. 1977) (table); 222 N.L.R.B. 955 (Jacksonville), enforced, 536 F.2d 1385 (5th Cir. 1976) (table)
 
 
 [11]
 See 220 N.L.R.B. 260 at 266
 
 
 [12]
 222 N.L.R.B. 955 (Jacksonville), enforced, 536 F.2d 1385 (5th Cir. 1976) (table). As noted by the Board in an earlier withholding of benefits case, "Respondent's history of unfair labor practices similar to those committed herein, and its recent history of other types of flagrant violations, indicate a course of unlawful conduct taken by Respondent in the service of designs inimical to the collective-bargaining process." 226 N.L.R.B. 123 at 124
 
 
 [13]
 220 N.L.R.B. 225 (1975) (Tampa), enforced in relevant part, 544 F.2d 896 (5th Cir. 1977) (unlawful interrogation and discharge of one employee); 223 N.L.R.B. 174 (1976) (Jacksonville) (improper no-solicitation rule, unlawful threats of punishment for engaging in union activity, interrogation of employees concerning union activity, unlawful discharge of one employee); 224 N.L.R.B. 45 (1976) (Tampa) (unlawful interrogation of one employee, discriminatory application of no-access rule to employees known or suspected to be union adherents); 224 N.L.R.B. 587 (1976) (Tampa), enforced, 552 F.2d 368 (5th Cir. 1977) (table) (coercive interrogation, threats of punishment for union activity, unlawful discharge of one employee). In two other unlawful discharge cases, enforcement was denied on the ground that the discharge was for a lawful purpose. 231 N.L.R.B. 651 (1977) (Tampa), enforcement denied, 586 F.2d 436 (5th Cir. 1978); 233 N.L.R.B. 491 (1977) (Tampa), enforcement denied, 587 F.2d 735 (5th Cir. 1979)
 
 
 [14]
 Florida Steel Corporation : 11-RC-3735 (Croft); 12-RC-4461 (Indiantown); 12-RC-4844 (Tampa); 12-RC-4845 (Jacksonville)
 
 
 [15]
 231 N.L.R.B. at 923, 926-27
 
 
 [16]
 231 N.L.R.B. at 927
 
 
 [17]
 The order of the Board in 233 N.L.R.B. 491 was denied enforcement, on substantive grounds, by the Fifth Circuit. Florida Steel Corp. v. NLRB, 587 F.2d 735 (5th Cir. 1979)
 
 
 [18]
 The company contends in this regard that "it was neither alleged nor shown that the Company's actions in this case affected employees outside the Indiantown plant, were ever calculated to do so, or ever practically prevented the Union from adequately representing the Indiantown unit." Brief for Petitioner Florida Steel, p. 11
 
 
 [19]
 See Alaska Barite Co., 197 N.L.R.B. 1023 (1972), enforced mem., 83 L.R.R.M. 2992 (9th Cir. 1973); NLRB v. S & H Grossinger's Inc., 372 F.2d 26 (2d Cir. 1967); NLRB v. Lake Superior Lumber Corp., 167 F.2d 147 (6th Cir. 1948). But see Hutzler Brothers Co. v. NLRB, 630 F.2d 1012 (4th Cir. 1980); Sabine Towing & Transportation Co. v. NLRB, 599 F.2d 663 (5th Cir. 1979); NLRB v. Tamiment, Inc., 451 F.2d 794 (3d Cir. 1971), cert. denied, 409 U.S. 1012, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972); NLRB v. Kutsher's Hotel and Country Club, Inc., 427 F.2d 200 (2d Cir. 1970)
 
 
 [20]
 The Court noted that in the absence of discrimination, "the union's asserted right of access for organizational activity has generally been denied except in cases involving unique obstacles to nontrespassory methods of communication with the employees." 436 U.S. at 205 n.41, 98 S.Ct. at 1761 n.41
 
 
 [21]
 While NuTone established the general relevance of the Babcock and Republic Aviation standards in the context of employer solicitation or unfair labor practices, it was not immediately clear whether those standards would be applied as rigorously in all instances of such conduct. The Court in NuTone stated that it was inappropriate to establish a per se rule that a union had a right of access to respond to an unlawful anti-union campaign, implying that such a per se rule was improper because it would apply whether or not "the employer's conduct to any considerable degree created an imbalance in the opportunities for organizational communication." 357 U.S. at 362, 78 S.Ct. at 1271. The Court thus left open the door for the possibility that some other standard might apply if the employer conduct created such an imbalance. The "organizational imbalance" language of NuTone seemingly has proved to have little effect in subsequent cases, however, on union rights of access to company property. As stated by one court, "(t)he determination of whether or not the employer conduct produced an imbalance in opportunities for organizational communications is dependent upon the existence or non-existence of alternative methods of communication open to the Union." May Department Stores Co. v. NLRB, 316 F.2d 797, 799 (6th Cir. 1963)
 
 
 [22]
 The Sixth Circuit later declared that, in a very specific situation, a union may be entitled to "equal time" to respond to a captive audience speech by an employer. In Montgomery Ward & Co. v. NLRB, 339 F.2d 889 (6th Cir. 1965), the court enforced a decision of the Board that an employer violated the Act in denying a union equal time to address employees following an anti-union employer speech, since the employer in that case had unlawfully prohibited employee solicitation in nonworking areas of the store during nonworking time (a "broad" but "unprivileged" rule). Montgomery Ward is thus one of the few instances in which a refusal by an employer to grant a union access to company property has been held to violate the Act, absent a showing that alternative means of communication did not exist
 
 
 [23]
 See note 21, supra
 
 
 [24]
 This requirement was upheld by the Supreme Court in NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)
 
 
 [25]
 See also Monogram Models, Inc., 192 N.L.R.B. 705 (1971); Falk Corp., 192 N.L.R.B. 716 (1971)
 
 
 [26]
 The Court in Hudgens also ruled that a union has no right of access from constitutional guarantees of free expression. 424 U.S. at 512-21, 96 S.Ct. at 1032-37. See also Asociacion de Trabajadores Agricolas de Puerto Rico v. Green Giant Co., 518 F.2d 130 (3d Cir. 1975)
 
 
 [27]
 In Sears, the Supreme Court noted that "the Court has indicated that Babcock extends to § 7 rights other than organizational activity." 436 U.S. at 204, 98 S.Ct. at 1761
 
 
 [28]
 Enforcement of two Board orders in which a union was granted access to company property during an organizational campaign has been denied recently because the Board placed a burden on the employer of proving that alternative means of communication existed. Belcher Towing Co. v. NLRB, 614 F.2d 88 (5th Cir. 1980); Sabine Towing & Transportation Co. v. NLRB, 599 F.2d 663 (5th Cir. 1979)
 
 
 [29]
 See Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941); NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 348-49, 73 S.Ct. 287, 289-90, 97 L.Ed. 377 (1953); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964); NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32, 89 S.Ct. 1918, 1939 n.32, 23 L.Ed.2d 547 (1969)
 
 
 [30]
 See also Consolidated Edison Co. v. NLRB, 305 U.S. 197, 235-36, 59 S.Ct. 206, 219-20, 83 L.Ed. 126 (1938); Decaturville Sportswear Co. v. NLRB, 406 F.2d 886, 889 (6th Cir. 1969)
 
 
 [31]
 See J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 303 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967); J. P. Stevens & Co. v. NLRB, 417 F.2d 533, 538 n.9 (5th Cir. 1969)
 
 
 [32]
 See also NLRB v. Clinton Packing Co., 468 F.2d 953, 954 (8th Cir. 1972); J. P. Stevens & Co. v. NLRB, 417 F.2d 533, 537 (5th Cir. 1969); J. P. Stevens & Co. v. NLRB, 406 F.2d 1017, 1019, 1022 (4th Cir. 1968); Truck Drivers & Helpers Local 728 v. NLRB, 332 F.2d 693, 697 (5th Cir.), cert. denied, 379 U.S. 913, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964)
 
 
 [33]
 The importance of deferring to the expertise of the Board in such a situation has also been emphasized. As stated by the court in Amalgamated Local 355 v. NLRB, 481 F.2d 996, 1007 (2d Cir. 1973), "(t)he problem of how drastic to mold the remedy in a particular proceeding concerned with the latest in a series of violations calls for the sensitive exercise of administrative judgment, and we cannot substitute our own opinion for the Board's reasoned explication."
 
 
 [34]
 We endorse the suggestion of the Second Circuit in Amalgamated Local 355, supra note 33, that the imposition of remedies in the case of a recidivist violator particularly demands the sensitive exercise of administrative judgment and expertise
 
 
 [35]
 See, e. g., Kent Corp., 212 N.L.R.B. 595, 613 (1974), enforced in relevant part, NLRB v. Kent Corp., 530 F.2d 610 (5th Cir. 1976); Decaturville Sportswear Co. v. NLRB, 406 F.2d 886, 888-89 (6th Cir. 1969); United Dairy Farmers Cooperative Ass'n, 242 N.L.R.B. No. 179, at 10 (June 12, 1979); Betra Mfg. Co., 233 N.L.R.B. 1126, 1127, 1137 (1977), enforced, NLRB v. Betra Mfg. Co., 624 F.2d 192, 89 Lab.Cas. (CCH) P 12264 (9th Cir. 1980)
 
 
 [36]
 See Textile Workers Union v. NLRB, 475 F.2d 973, 975 n.3 (D.C.Cir. 1973); J. P. Stevens & Co. v. NLRB, 417 F.2d 533, 540 n.15 (5th Cir. 1969); Beyerl Chevrolet, Inc., 221 N.L.R.B. 710 (1975)
 
 
 [37]
 See also NLRB v. H. W. Elson Bottling Co., 379 F.2d 223 (6th Cir. 1967). The court in Elson refused to enforce that part of a remedial order that granted the union the right to hold two in-plant meetings on company time, in part because "this record shows no problem of union access to or communication with employees of this company." 379 F.2d at 227 (citing Babcock). The court modified the order, however, to grant the union equal time to respond to any speech made by the employer on the question of union representation
 
 
 [38]
 NLRB v. Crown Laundry & Dry Cleaners, Inc., 437 F.2d 290, 294 (5th Cir. 1971) (civil contempt); NLRB v. Johnson Mfg. Co., 511 F.2d 153, 157 (5th Cir.) (civil contempt), cert. denied, 423 U.S. 867, 96 S.Ct. 130, 46 L.Ed.2d 97 (1975); Scottex Corp., 200 N.L.R.B. 446, 455 (1972)
 
 
 [39]
 See also Dee Knitting Mills, Inc., 214 N.L.R.B. 1041, 1051 (1974), enforced, NLRB v. Dee Knitting Mills, Inc., 538 F.2d 312 (2d Cir. 1975); Fuqua Homes Missouri, Inc., 201 N.L.R.B. 130, 135 (1973)
 
 
 [40]
 While the immediate employer involved had only one plant, that employer was owned and controlled by a company with 17 other plants
 
 
 [41]
 See J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 304 (2d Cir.), cert. denied, 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967); 406 F.2d 1017, 1021-22 (4th Cir. 1968); 612 F.2d 881, 882 (4th Cir.), cert. denied, -- U.S. --, 101 S.Ct. 315, 66 L.Ed.2d 145 (1980); 623 F.2d 322, 327 (4th Cir. 1980), cert. denied, -- U.S. --, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); Gerry's Cash Markets, Inc. v. NLRB, 602 F.2d 1021, 1025 (1st Cir. 1979); NLRB v. Jack LaLanne Management Corp., 539 F.2d 292, 295 (2d Cir. 1976); Texas Gulf Sulpher Co. v. NLRB, 463 F.2d 778, 779 (5th Cir. 1972); Winn-Dixie Stores, Inc., 236 N.L.R.B. 1547, 1551 (1978); Alberts, Inc., 213 N.L.R.B. 686, 698 (1974), enforced, NLRB v. Albert's, Inc., 543 F.2d 417 (D.C.Cir. 1976). But see Wesselman's Enterprises, Inc., 248 N.L.R.B. 1017, 1017 n.2 (1980); Wolverine World Wide, Inc., 243 N.L.R.B. No. 72, at 2 (July 12, 1979); Pacific Gas & Electric Co., 234 N.L.R.B. 739, 739 n.2 (1978)
 
 
 [42]
 See also J. P. Stevens & Co. v. NLRB, 638 F.2d 676 (4th Cir. 1980)
 
 
 [43]
 The remedial order in Teamsters involved only one plant
 
 
 [44]
 It is possible that employees at an organized plant, represented by an established union and protected by a collective bargaining agreement, are less likely to be coerced by employer conduct at another company location than employees at an unorganized plant
 
 
 [45]
 Too often the Board has invoked a history of past violations as justification in itself for extraordinary access remedies. It is not a history of unlawful conduct that justifies access as a remedial measure, but rather it is the effects that such a history may produce. The Board must demonstrate, through evidence and carefully articulated presumptions, that such effects have occurred or are likely to occur. In doing so, the Board must consider, for example, the seriousness of the violations involved, the amount of time between violations, and the extent to which employees know or may have reason to know of past incidents of unlawful conduct. We do not suggest that the Board has failed in all cases to consider these factors. For instance, in Wolverine World Wide, Inc., 243 N.L.R.B. No. 72 (July 12, 1979), the Board held that three instances of misconduct committed during a period of time of six to fourteen years were too remote in time from the instant proceeding to support a finding that the employer had a proclivity to violate the Act
 
 
 [46]
 See Florida Steel Corp., 220 N.L.R.B. 260, 266 (1975); Florida Steel Corp., 231 N.L.R.B. 923, 926 (1977)